Edward J. ROBERTS, et al.,
Plaintiffs-Appellants,

v.

ELAINE POWERS FIGURE SALONS,
INC., et al., Defendants-Appellees.

No. 81–4647.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 13, 1982.

Decided June 24, 1983.

Judy R. Campos, Hefner, Stark & Marios, Sacramento, Cal., for defendants-appellees.

Charles P. Wolff, Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., for plaintiffs-appellants.

Before MERRILL, Senior Circuit Judge, BOOCHEVER, Circuit Judge, and SMITH,[*] Senior District Judge.

BOOCHEVER, Circuit Judge:

This is an appeal from entry of summary judgment on a claim of unlawful tying in violation of the Sherman Act. The district court held that there was no unlawful per se tying arrangement between the sale of a franchise (the alleged tying product) and bookkeeping services (the alleged tied product) provided by an independent corporation. We hold that this case is not appropriate for summary judgment because there are genuine issues of material fact. We reverse and remand for trial.

---

*Background*

Plaintiffs-appellants are Edward Roberts, a Michigan resident who purchased nine franchises from defendants-appellees, and nine corporations formed by Roberts to operate the franchises ("Roberts"). Defendants-appellees are Elaine Powers Figure Salons, Inc., No. 1 Elaine Powers Figure Salons, Inc., and Unicare, Inc. ("Elaine Powers"). Unicare purchased the Elaine Powers companies in 1970.

In 1973, Roberts filed suit against Elaine Powers alleging violations of the federal antitrust and securities laws and common law fraud. Several counts included in the original cause of action have been withdrawn. All that remains on appeal is Roberts' claim that Elaine Powers violated section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully tying the purchase of bookkeeping services to the purchase of Elaine Powers franchises.

Elaine Powers began establishing figure control salons in 1964. In 1966, the company commenced selling franchised salons under the Elaine Powers trademark. By late 1969, Roberts had opened nine franchised salons. The franchise agreements all contained a clause stating:

> [T]he bookkeeping for the salon shall be done by a bookkeeping service used and designated by the Franchisor. Such service shall be retained both during the initial period and thereafter so long as Franchisee operates under this franchise.

Under this provision, the franchisee was required to send daily financial and statistical reports to the franchisor and to submit payroll cards and bills. Checks were prepared by the franchisor's head office and mailed back to the franchisee for distribution. The bookkeeping service was to prepare quarterly tax reports, monthly operating statements, annual financial statements, and income tax returns.

Elaine Powers designated Gillanders, Inc., as the franchise bookkeeping service.

---

[*] Honorable Russell E. Smith, Senior United States District Judge for the District of Montana, sitting by designation.

Ken Gillanders, an independent accountant, started doing bookkeeping work for Elaine Powers from its inception in 1964. In 1966, Mr. Gillanders incorporated his business; he and his wife were the sole shareholders. When Mr. Gillanders first started doing work for Elaine Powers, he had fifteen or more other clients. As the Elaine Powers corporations prospered, he dropped the other clients and worked exclusively for Elaine Powers. Gillanders, Inc., merged with Elaine Powers in 1970.

Roberts had problems with the bookkeeping services and complained to Elaine Powers and Gillanders. He said his creditors were not being paid promptly since Elaine Powers did not always prepare payment checks on time. He also complained about Gillanders' tax accounting services. Roberts visited the Elaine Powers offices in California twice to discuss the problems and requested permission to use his own bookkeeping service. His request was denied.

In March 1970, Roberts notified Elaine Powers he would no longer use Gillanders, Inc., as his bookkeeping service, but he wished to remain an Elaine Powers franchisee. In August 1970, before the Elaine Powers and Gillanders merger, Elaine Powers notified Roberts that his nine franchises were terminated for his failure to make payments to the franchisor, refusal to send bookkeeping records, failure to have checks countersigned by Elaine Powers, failure to submit leases for approval, and purchasing supplies from companies owned by Roberts at higher than market prices in violation of the franchise agreement.

Roberts continued to operate the salons, using the Elaine Powers name on eight salons. By June 1970, all but one had gone out of business. The ninth closed in May 1973.

Elaine Powers moved for summary judgment on Roberts' two remaining counts, which alleged that Elaine Powers unlawfully conditioned the sale of the franchises on the purchase of salon equipment and bookkeeping services, all at excessive prices, and that Elaine Powers illegally terminated the nine franchises because Roberts refused to abide by the unlawful tying arrangement. Arguments on the motion were heard in June 1977. While a decision on the motion was pending, this court handed down its decision in *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir.1977), and the district court ordered further briefing. On, December 22, 1980, the district court granted summary judgment for Elaine Powers on both the salon equipment and bookkeeping service tying claims. The court held, inter alia, that Roberts could not establish that Elaine Powers had an economic interest in the bookkeeping service. Judgment was entered on November 24, 1981. Roberts appeals only the bookkeeping issue.

### Standard of Review

We conduct de novo review of a motion for summary judgment. *State ex rel. Edwards v. Heimann*, 633 F.2d 886, 888 n. 1 (9th Cir.1980). We must view the evidence in the light most favorable to Roberts to determine if there is a genuine issue as to any material fact and, if not, whether Elaine Powers is clearly entitled to prevail as a matter of law. *Id.* at 888. The Supreme Court has cautioned courts to use summary judgment relief sparingly in antitrust cases. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). There is no blanket exemption of antitrust claims from summary judgment, however, and such relief may be appropriate, especially in those cases where motive and intent are not determinative. *See White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963); *THI-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 994 (9th Cir.1980).

### Discussion

#### A. Tying Arrangement

Roberts alleges that Elaine Powers maintained an unlawful tie-in in violation of section 1 of the Sherman Act, which prohibits all agreements in restraint of trade or commerce. A tie-in is established when a seller refuses to sell one product (the tying product) unless the buyer also

purchases another (the tied product). Such an arrangement is presumptively unlawful if certain elements exist; once those elements are demonstrated, no specific showing of unreasonable anticompetitive effect is required. *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1211 (9th Cir.1977) (*Moore II*).[1]

■ In *Moore II*, we set out the elements of an unlawful tie-in. First, there must be a tie-in between two distinct products or services. Second, the defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market. Third, the plaintiff must show that a not insubstantial volume of commerce in the tied product market is affected. *Id.* at 1212.

■ *Moore II* raised two additional questions. The court must ask whether the seller of the tying product has an "economic interest" in the tied product, and whether a "modicum of coercion" was exerted upon the purchaser by the seller of the tying item. *Id.* at 1216. Our focus in this case is on the requirement that the seller have an economic interest in the tied product, *i.e.,* that Elaine Powers has an economic interest in the Gillanders' bookkeeping service.

Roberts argues that there are genuine issues of material fact as to whether Elaine Powers had an economic interest in the bookkeeping service. He raises four indicia of the alleged economic interest which could tend to show that Elaine Powers received direct economic benefits from Gillanders, Inc.

First, Gillanders, Inc., transferred approximately $10,000 to Elaine Powers in early 1970. Elaine Powers calls this a loan, but the record reveals no written loan agreement, interest rate, or repayment term. There is no record of repayment, but Elaine Powers claims that the loan was either repaid directly or through appropriate credits and transfers at the time of the 1970 merger.

Second, Mrs. Gillanders received payments from Gillanders, Inc., while she worked exclusively for Elaine Powers. As a top management employee of Elaine Powers, she received $18,000–$22,000 per year. Payments from Gillanders, Inc., ranged from $5,000–$9,000 per year. In addition, she received dividends as a shareholder in Gillanders, Inc. in amounts ranging from nothing the first year to $6,000–$8,000 the last year.

Roberts contends that these payments were a form of kickback to Elaine Powers made by Gillanders, Inc. Elaine Powers argues that they were compensation to Mrs. Gillanders for her ownership interest in Gillanders, Inc.

Third, Mr. Gillanders served as secretary-treasurer of Elaine Powers without receiving any compensation. Roberts characterizes this as another economic benefit to Elaine Powers from Gillanders, Inc. Mr. Gillanders stated he performed his duties "merely as a convenience" to facilitate performance of his accounting duties, for which Gillanders, Inc. was compensated directly by the franchisees.

Fourth, Mr. and Mrs. Gillanders owned No. 13 Elaine Powers Figure Salons, Inc., which owned and operated two salons. In the 1970 merger agreement, the president and cofounder of Elaine Powers, Dr. Richard Proctor, became sole shareholder in No. 13. The Gillanders received no compensation from Dr. Proctor for this transfer. Elaine Powers contends that the salons ceased doing business before the merger.

Elaine Powers argues that summary judgment was proper because a jury could not reasonably conclude that Elaine Powers received economic benefits from Gillanders,

---

1. In *Moore II*, this court held that the district court had erred as a matter of law in entering judgment for the defendants on the two tying claims (the sales tie and installation tie) and vacated judgment, remanding for further proceedings. The district court erroneously interpreted our remand and relitigated the tying issues, holding for the defendants on the installation tying claim. On appeal from that decision, we reaffirmed our holding in *Moore II* that the plaintiffs had established unlawful tie-ins on both the sales and installation tying claims. *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 834–35 (9th Cir.1982) (*Moore III*).

Inc. It suggests that the *Moore II* "economic interest" test requires that to establish an actionable tie-in, Roberts must show that Elaine Powers actually sold the tied product. We do not read *Moore II* to require an actual sale of the alleged tied product by the seller of the tying product. In *Moore II,* we found that unlawful tying arrangements existed where cemeteries, the defendants, conditioned the sale of cemetery lots (the tying product) on the buyer's use of the cemeteries' installation and care service (the tied product). Additionally, it was unlawful for the cemeteries to require a lot purchaser to buy grave markers (tied products) from or through the cemeteries. *Moore II,* 550 F.2d at 1216. The "through" sales of grave markers were not made directly by the cemeteries, thus there was no actual sale of the tied product by the sellers of the tying product. The cemeteries' receipt of a commission or profit on monument sales was sufficient to satisfy the "economic interest" test.

The test was also met in *United States v. Mercedes-Benz of North America, Inc.,* 517 F.Supp. 1369 (N.D.Cal.1981). The court in that case held that the defendant, Mercedes-Benz, had an economic interest in the tied product, automobile replacement parts. Dealers obtained the parts from many sources, including the defendant, the defendant's parent company, independent automotive parts manufacturers, and independent warehouse distributors. Despite the fact that Mercedes-Benz was not the sole seller of the tied product, the court held that it had a direct economic interest in sales of the replacement parts and in many cases benefitted from a higher-than-average market price for the parts. *Id.* at 1378 n. 10. The court denied the cross-motions for summary judgment and remanded the case for trial on the question of whether Mercedes-Benz held sufficient economic power in the market. *Id.* at 1387.

The court in *Esposito v. Mister Softee, Inc.,* 1980–1 Trade Cas. (CCH) ¶ 63,089 (E.D.N.Y. Dec. 14, 1979) also found an economic interest where there was no direct sale by the seller of the tying product. In *Esposito,* franchisees of a regional division

of Mister Softee, Inc. alleged that their franchises for the vending of soft ice cream under the trademark of Mister Softee were conditioned upon a tying arrangement in violation of section 1 of the Sherman Act. The franchisees contended that the defendants, the Mister Softee franchisor and various suppliers, conditioned the franchisees' right to use the Mister Softee trademark (the tying product) on their purchase of supplies (the tied product) from a designated supplier. Mister Softee claimed that it had no economic interest in the sale of tied products by Ro-Fi, a named defendant, designated supplier of Mister Softee ice cream mix and other merchandise, and operator of a Mister Softee truck depot. The court rejected that claim, holding that Mister Softee was financially involved in the sale of tied products to franchisees. It sold some of the tied products to Ro-Fi and some of the ingredients of the ice cream mix to the dairy which sold the mix to Ro-Fi. In addition, Mister Softee used the tie-in as part of the consideration given to a third defendant to induce that party to act as the regional distributor. *Id.* at 77,424.

▬ These cases suggest that economic interest may take a form other than profit from a direct sale of the tied product by the seller of the tying product. The involvement of a third party in a financial transaction, however, may insulate the seller of the tying product from an allegation of restraint of trade in the absence of evidence that the defendant has an economic interest in the sale of the tied product. In *Keener v. Sizzler Family Steak Houses,* 597 F.2d 453 (5th Cir.1979), for instance, the court held that the defendant franchisor had no financial interest in the building contractor whom it had designated to build a new franchise restaurant. The franchisor received no income from the contractor's sales and no rental income from the building. "There is no illegal tying arrangement where a 'tying' company has absolutely no interest in the sales of a third company whose products are favored by the tie-in." *Id.* at 456. Where, as here, however, there is evidence of direct payments from the

third company to the franchisor and one of its employees, a triable issue of fact is presented.

Elaine Powers argues that Roberts must raise more than mere allegations to show the existence of a genuine issue of material fact. Roberts does raise more than "mere allegations" here; specifically, he calls attention to the fact that there are no records of the loan and that Mrs. Gillanders received both dividends and payments from Gillanders, Inc. while she was employed by Elaine Powers. A jury could reasonably find that the "loan" was in fact a gratuitous payment made by Gillanders, Inc., as consideration for Elaine Powers requiring that its franchisees use Gillanders' services. Similarly, the payments made by Gillanders, Inc. to Mrs. Gillanders could be regarded as a contribution to Elaine Powers because Mrs. Gillanders' services were rendered exclusively to Elaine Powers. For example, if Gillanders, Inc. agreed to pay the salary of an Elaine Powers' employee as consideration for receiving the accounting business, it is clear that Elaine Powers would have an economic interest in the accounting service. Viewing all evidence and inferences in the light most favorable to Roberts, we find that there are genuine issues of material fact related to the economic interest requirement.

### B. *Separate Products*

■ In its motion for summary judgment, Elaine Powers also argued that its franchise and the bookkeeping service are not separate products. Therefore, Elaine Powers contends that the first element of an unlawful tying arrangement, two distinct products or services, is not present, and Elaine Powers is entitled to summary judgment as a matter of law. Because we make a de novo review of a motion for summary judgment, and we may affirm on any basis supported by the record, *United States v. County of Humboldt,* 628 F.2d 549, 551 (9th Cir.1980), we now consider this contention on appeal.

This court discussed the separate products requirement in *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). In *Chicken Delight,* we were asked whether an unlawful tying arrangement existed when a franchisor conditioned the grant of a franchise upon the purchase of items used in the franchise business, such as cooking equipment, food mixes and packaging goods. The district court ruled as a matter of law that the license to use the Chicken Delight name, trademark, and method of operations was a tying item, and that the arrangement involved distinct products. We affirmed. The Chicken Delight franchise system was set up not to distribute the trademarked goods of the franchisor, but to conduct a certain business under a common trade name. The name of the franchise reflected the goodwill and quality standards of the enterprise which it identified. We stated:

> [I]t is apparent that the goodwill of the Chicken Delight trade-mark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product.... It is to the system and the end product that the public looks with the confidence that established goodwill has created.

*Id.* at 49.

■ The Elaine Powers franchise system is similar to that discussed in *Chicken Delight.* The primary product marketed by Elaine Powers is figure control. The alleged tied product, the bookkeeping service, is an element of the business method employed by Elaine Powers to maintain certain quality standards. Like the trademark in *Chicken Delight,* the franchise license here reflects the goodwill and quality standards of the Elaine Powers business format. The goodwill associated with that franchise does not attach to the bookkeeping service used in the operation of the franchise system. We therefore hold that the franchise and the bookkeeping service are separate products.[2]

**2.** For further discussion of the distinction be-     tween the business format and distribution

### C. Justification

Elaine Powers argues that it needs and performs a complete bookkeeping service for each franchise to protect its investment, compute the amount of gross profits to which it is contractually entitled, and compile reports for planning purposes. It relies on *Principe v. McDonald's Corp.,* 631 F.2d 303 (4th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981), to contend that because the bookkeeping service provided by Gillanders, Inc., was an "essential ingredient of the Elaine Powers formula for success", it was indistinct from the franchise.

The issue in *Principe* was whether the defendant franchisor's requirement that its licensees operate their franchises in premises leased from the franchisor was an unlawful tying arrangement in violation of section 1 of the Sherman Act. The Fourth Circuit held that the McDonald's franchise, building lease, and security deposit note required of franchisees were not separate products, but component parts of an overall franchise package. Because McDonald's Corporation chose each restaurant site, owned and built all of the restaurants, and carefully selected their franchisees based on the latters' management potential, the court characterized the relationship between McDonald's and the franchisee as a form of partnership and the alleged tied products as the "integral components of the business method being franchised." *Id.* at 309–10. It affirmed the summary judgment and directed verdict for McDonald's on the tying claims. *Id.* at 308.

*Principe* addressed the requirement that a tying arrangement involve two distinct products. We concluded above that this case does involve separate products, and we believe that the facts in *Principe* are not close enough to the facts here to warrant a holding that the accounting service was an integral part of the Elaine Powers franchise system. Elaine Powers' arguments as to its need for the Gillanders bookkeeping service, however, may be viewed as an attempt to justify the alleged tying arrangement. We look again to our circuit's statements on this point. In *Chicken Delight,* we stated that the question of whether it was essential to the franchise that the tied products be purchased from Chicken Delight raised the issue of whether the tie-in was justifiable, not whether a tie-in existed. *Chicken Delight,* 448 F.2d at 49. Thus, in this case, if the trier of fact finds that a tying arrangement existed, it then turns to the question of whether the bookkeeping services provided by Gillanders, Inc. were so essential to Elaine Powers as to justify the tie-in and shield Elaine Powers from liability.

The defendant in *Chicken Delight* raised three bases for justification of its tying arrangement. We affirmed the district court's conclusion there that the arrangement was not justified, because less restrictive alternatives were available to the franchisor. For example, the lower court had ruled that the franchisor could easily specify what it required in the tied packaging items, so that other manufacturers could furnish suitably like products. *Id.* at 51–52. The jury made a similar finding with respect to the cooking equipment and food mixes. *Id.* at 51.

■ We cannot, on the record before us, determine whether the business justification applies here. The question of whether a different accounting method, including service by one or more other competent accounting firms, could satisfy the business requirements of Elaine Powers and avoid the anticompetitive effects of a tie-in presents a triable issue of fact. If a tying arrangement exists, the trier of fact shall determine whether Elaine Powers has a business justification excusing it from liability.

### Conclusion

We hold that summary judgment was inappropriate in this case and remand for trial on the question of whether Elaine

---

franchising systems, see *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1352–54 (9th Cir.1982); *Hamro v. Shell Oil Co.,* 674 F.2d 784, 787–88 (9th Cir.1982).

Powers has an economic interest in Gillanders, Inc.

REVERSED and REMANDED.[3]

---

**3.** We need not reach Roberts' contention that Elaine Powers and Gillanders, Inc. were so closely related as to obviate the need to show that a direct economic benefit flowed from Gillanders, Inc. to Elaine Powers. If the trier of fact should find that Elaine Powers had no such economic interest in the accounting services as to constitute an element of an unlawful tie-in, it would follow that Elaine Powers and Gillanders, Inc. were not so related as to eliminate the economic interest requirement. We express no opinion whether in a suitable case a plaintiff could demonstrate economic interest by the nature of the relationship between the sellers of the tying and tied products.