Caroline **CASEY**, Mary Anne Johnson and Peggy Garvey, individuals, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**DIET CENTER, INC.**, a corporation, Jenkins Diet Centers, Inc., a corporation, Seth L. Jenkins, dba Jenkins Diet Center, a sole proprietorship, Seth L. Jenkins, S. Bradley Jenkins, Cathy R. Jenkins, Verla Archibald, individuals, and all others similarly situated, Defendants.

No. C–83–1043–WWS.

United States District Court,
N.D. California.

July 17, 1984.

Richard B. McDonough, Elizabeth G. Leavy, Carroll, Burdick & McDonough, San Francisco, Cal., for plaintiffs.

Ralph C. Alldredge, San Francisco, Cal., Daniel L. Berman, Berman & Anderson, Gary F. Bendinger, Giauque & Williams, Salt Lake City, Utah, for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This is an antitrust action brought by subfranchisees of defendant Diet Center, Inc., which franchises a system to promote weight loss and control for individual clients. Plaintiffs claim that defendants require franchisees[1] to purchase from Diet Center, Inc., at excessive prices the Diet Center Diet Supplement ("Diet Supp"), a nutritional tablet Diet Center clients must take. They argue that the forced purchase of Diet Supp constitutes a tying arrangement illegal per se under Section 1 of the Sherman Act, 15 U.S.C. § 1. The action is before the Court on cross-motions for summary judgment on the issue whether the purchase requirement is an illegal tying arrangement. No facts material to the disposition of these motions are in dispute, and no triable issue is presented.

### I. *Background Facts.*

Diet Center is a nation-wide chain of approximately 1830 franchised weight-con-

---

1. Although plaintiffs are technically subfranchisees, they will be referred to as franchisees except where the context requires otherwise.

trol centers. The franchise is structured in three tiers. Diet Center, Inc., the primary franchisor, sells franchises to area franchisees who are permitted to subfranchise; area franchisees operate a total of 350 outlets directly, and subfranchise another 1130 outlets to third-tier operators. Plaintiff Garvey is a third-tier operator who subfranchises from defendant Jenkins Diet Centers which is an area franchisee of defendant Diet Center, Inc. Plaintiffs Casey and Johnson are joint operators who subfranchise one outlet from defendant Archibald, also an area franchisee of Diet Center, Inc., and a second outlet from defendant Jenkins.

Diet Center offers a five-phase weight-control program, the second or "reducing" phase of which is relevant here. Clients in that phase (1) attend daily personalized counseling sessions, (2) follow prescribed diets, (3) have access to nutrition and behavior modification classes, and (4) take various nutritional products daily, including eight Diet Supps which they obtain from their Diet Center outlet. Clients pay a weekly fee which covers all costs including that of the Diet Supps.

The Diet Supp is a chewable tablet consisting of a vitamin B complex in a base of soy protein and invert sugar, together with panothenic acid and niacin. Its inactive ingredients, not listed on its label, are excipients and binding agents which give the supplement its taste, texture, and consistency. It serves as a nutritional supplement, an appetite depressant, and a digestive, and both parties concede its importance to the Diet Center program.

All Diet Center franchisees must purchase their requirements of Diet Supps (either directly or through a subfranchisor) from Diet Center, Inc., which has produced the tablets at an in-house laboratory since early 1980; before then, Diet Center, Inc., had the supplement manufactured by outside sources. Diet Center, Inc., has never sold Diet Supps separately from its weight control program. Supplements with the same active ingredients are or could be made available from other sources, but Diet Center, Inc., claims that the quality of its ingredients and the particular excipients

it uses to create taste and texture are secret and unique.

Diet Center franchisees are charged a refundable "initial franchising fee" of $24,-000 (this amount has varied over the years) and a "continuing License Fee" of approximately $1.05 per dieter per day of enrollment in the program. It is unclear from the record whether the license fee is a charge solely for the Diet Supp, solely for the franchise (i.e. a royalty), or both, primarily because Diet Center, Inc., has been inconsistent in characterizing the fee in license agreements, disclosure documents, and promotional literature. In any event, the fee covers the cost of the Diet Supp. Defendants do not appear to dispute that a dieter's daily ration of Diet Supps costs Diet Center, Inc., from 35 to 45 cents to produce, an amount it has also on occasion characterized as the price to subfranchisors of the Diet Supp. Subfranchisors pass along these charges to subfranchisees with a mark-up of about 50 cents which covers their charge for processing orders for the Diet Supp. Plaintiffs maintain that products equivalent to the Diet Supp are available for 25 to 30 cents from various sources including a former Diet Center franchisee, a Diet Center competitor, and the laboratory which originally produced the Diet Supp.

## II. *Does the Diet Center Franchise Package Tie Separate Products?*

Diet Center, Inc., offers its franchisees a comprehensive program of weight reduction and control services, products, and techniques. Sufficient goodwill attaches to the Diet Center trademark to induce franchisees to pay for the right to operate the program and pay for its component products such as the Diet Supp. Plaintiffs argue that this franchise arrangement is a tying agreement illegal per se because it ties two products and because Diet Center possesses sufficient market power in the tying product to appreciably restrain trade in the tied product, *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969) (*"Fortner I"*); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct.

514, 518, 2 L.Ed.2d 545 (1958); *California Glazed Products, Inc. v. Burns & Russell Co.*, 708 F.2d 1423, 1427 (9th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).[2] Defendants argue first that the trademarked franchise and the Diet Supp are inseparable components of a single product which is therefore not subject to scrutiny as a tying arrangement.

In its recent decision in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* — U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court held that defendant hospital's requirement that its patients employ the services of a specified group of anethesiologists did not violate Section 1. A majority of the Court, however, rejected defendants' contention that hospital services and those offered by the anesthesiologists were inseparable merely because they were functionally integrated:

> Our cases indicate ... that the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items.

104 S.Ct. at 1562.

The Court relied on *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), which held that advertising in a morning newspaper and in an afternoon newspaper was a single product because the purchasing advertisers viewed the newspaper reading public of both papers as fungible and not distinct, *id.* 345 U.S. at 613–14, 73 S.Ct. at 883. *Hyde* thus defined the test for separate products to be whether the arrangement "link[s] two distinct markets for products ... distinguishable in the eyes of

buyers," 104 S.Ct. at 1562. That test, it held, derives from the underlying rationale for the rule against tying to prohibit only those arrangements which create the possibility of "foreclos[ing] competition on the merits in a product market distinct from the market for the tying item," *id.* at 1563.

In *Hyde,* plaintiff presented evidence that patients differentiated between hospital services and anesthesiological services: the latter were frequently separately arranged for and paid for. No such evidence is offered here. Although alternatives to the Diet Supp do exist, it does not follow that the purchase of the Supp or its equivalents by franchisees creates a distinct market. Under *Hyde,* "no tying arrangement can exist unless there is a sufficient demand for the purchase of the [tied product] separate from the [tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]," 104 S.Ct. at 1563.

Here the demand for the Diet Supp is not separate from that for the franchise: it is generated wholly by the franchisee's operation of the franchise. Were it not for the Diet Center's franchised weight control program, there would be no market for the Diet Supp. Indeed, the Diet Supp may be purchased only by Diet Center franchisees who use it solely as an integral part of the Diet Center method.[3] Treating the Diet Supp as a separate market would thus not serve the purpose of the tying rule to protect distinct markets from anticompetitive restraints.

Ninth Circuit decisions have sought to address the separate products issue by application of two tests. In *Siegel v. Chicken*

---

**2.** The Ninth Circuit often transforms the per se rule into one of presumptive illegality. *See, e.g., Moore v. Jas. H. Mathews & Co.,* 550 F.2d 1207, 1213 (9th Cir.1977) ("the presumptive illegality of tie-ins"); *Roberts v. Elaine Power Figure Salons, Inc.,* 708 F.2d 1476, 1479 (9th Cir.1983) (tying arrangements "presumptively unlawful" if certain elements exist). *But see Digidyne v. Data General Corp.,* 734 F.2d 1336 (9th Cir.1984) (referring to per se illegality). There is, however, no discernible distinction between that rule and the per se rule. The difference in terminology arises from the opportunity the

Ninth Circuit affords a defendant to justify an otherwise illegal tie. *See, e.g., Moore, supra.*

**3.** This may be what the Court had in mind when it stated:

> Similarly, when a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

104 S.Ct. at 1560.

*Delight, Inc.,* 448 F.2d 43, 48 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), the court articulated a "function of the aggregation" analysis, but this has quite clearly been rejected in *Hyde.* More recently, the court, in *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1353 (9th Cir.1982), and subsequent decisions, rested on a distinction between business format systems and distribution systems, making the determination of separateness of franchised trademarks and component products turn primarily on the extent to which the trademark is associated in the public mind with the source of the allegedly tied product. *See also Roberts, supra* note 2, 708 F.2d at 1481; *California Glazed Products, supra; Hamro v. Shell Oil Co.,* 674 F.2d 784, 787–88 (9th Cir.1982).

→ *Hyde,* at least implicitly, appears to reject this approach. First, the Ninth Circuit

test generates legal results based on the application of conclusory labels [4] unrelated to the focus of the "tying" inquiry set forth in *Hyde* —"whether the arrangement may have the type of competitive consequences addressed by the rule [against tying]." Characterizing a particular franchise as business format or distributional does not aid in weighing the economic benefits that society is acknowledged to derive from franchises against any potential harm from the tie of component products. *See, e.g., Sullivan, Antitrust* 448–49 (1977).[5]

Second, the *Krehl* test directs attention to the market in which the ultimate consumer purchases but *Hyde* requires that "any inquiry ... must focus on the ... markets in which the two products are sold" and in which "the anti-competitive forcing has its impact," 104 S.Ct. at 1561.

**4.** "Easy labels do not always supply ready answers." *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). The Third Circuit has expressed a similar concern:

> We are genuinely concerned that the law of tying is becoming a kind of semantic shell game, resting more on key words than on careful analysis. For that reason, we feel compelled to take a pragmatic and prudential, as well as jurisprudential, view of the problem before us, taking into our perspective both the nature of the franchising industry and the effects which may be perceived to flow from the decision under review.

*Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1222 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

**5.** There are compelling reasons against imposing on franchisors the uncertainty and risk of presumptive illegality inherent in courts' reliance on arbitrary labels. It is doubtful that a franchise agreement requiring franchisees to purchase certain products from the franchisor is so "plainly anticompetitive" or "lacking in redeeming virtue" as to warrant presumptive condemnation unless it can be fitted into the distribution system category. *See Broadcast Music, supra* note 4, 441 U.S. at 8, 99 S.Ct. at 1556 (blanket licenses of musical composition not unlawful per se).

Courts have recognized that tying may serve legitimate, procompetitive purposes, *see, e.g., United States Steel Corp. v. Fortner Enters., Inc.,* 429 U.S. 610 at 619, n. 10, 97 S.Ct. 861 at 867, n. 10, 51 L.Ed.2d 80 (1977) (*"Fortner II"*). It may

for example, create certain production economies, see, e.g., *Principe v. McDonald's Corp.,* 631 F.2d 303 (4th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981), cited in *Roberts,* 708 F.2d at 1482; ensure quality control and consumer good-will, *see, e.g., California Glazed Products; Krehl,* 664 F.2d at 1353–54; and protect nascent industries, *see United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545 (E.D.Pa.1960), *aff'd,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

Moreover, courts and commentators agree that franchising itself enhances the ability of small businesses to compete effectively. *See GTE Sylvania v. Continental TV, Inc.,* 537 F.2d 980, 999–1000 (9th Cir.1976), *aff'd,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Other attributes often credited to franchising are that it tends to promote competition by expanding the number of sales outlets and creating efficiencies of production and distribution otherwise unattainable. It facilitates market entry by small enterprises with little start-up capital. It retards the tendency toward vertical integration. It facilitates quality control and protection of franchisors' goodwill. And it promotes the development of innovative production techniques and expertise. *See Note, A Clarification and Reformulation of Prevailing Approaches to Product Separability in Franchise Tie-In Sales,* 67 Minn.L.Rev. 1165, 1173–75 (1983); *Note, A New Approach to the Legality of Franchising Tie-Ins,* 129 U.Pa.L.Rev. 1267, 1276–77 (1981). Thus, disincentives to the use of franchise arrangements created by the threat of per se or presumptive illegality dependent on vague and conclusory characterizations may affect the economy adversely.

In the franchise context, the markets in which the tying and tied products are sold are those in which the *franchisees* purchase. Thus whether the franchise arrangement ties separate products is not necessarily related to the perception of ultimate consumers who purchase in a different market downstream from that of the franchisees.

Finally, franchise arrangements cannot necessarily be fitted into one of the two *Krehl* categories based on consumer perceptions and an assessment of good will. The present case is an example. The Diet Center trademark and franchise represent a program comprising numerous components, including daily weigh-ins and counseling, daily doses of Diet Supp, Vitamin C and calcium, specified diets, and weekly nutrition and behavior classes. Clearly this is not a simple distribution system in which the trademark and goodwill attach only to products manufactured by or otherwise identified with the manufacturer as in *Krehl* or *California Glazed Products.* Nor is it a business format system in which the trademark represents only a way of conducting business but not a particular component product, as was true of the Chicken Delight franchise in *Siegel.*

This case illustrates the difficulty of principled and consistent application of a test based on consumer perception. The individual client may not attach great significance to a particular component or product of the Diet Center program but the franchisor may reasonably treat each as an essential ingredient. Whether a particular product is essential to the program is more likely perceived by its creator than by consumers who are concerned with the end results obtained from participation rather than with the reasons for the program's success. Comparing the Diet Supp taken each day by Diet Center customers who may or may not give thought to its source with the paper plates on which fast-food customers are served their fried chicken is not helpful to arriving at a sound disposition of this case.

 In sum, where, as here, franchisees bargain for the right to use a package of products and services none of which represents a market distinct from that of the franchise itself, the competitive purposes of the rule against tying are not served by fractionating the franchise into separate components.[6] In the absence of any evidence offered to establish the existence of a distinct market for the Diet Supp, the requisite element of separate products is not satisfied, there is thus no illegal tie,[7] and defendants are entitled to summary judgment on this issue.

III. *Does Diet Center, Inc., Possess Sufficient Market Power for Application of the Per Se Rule?*[8]

[3] Even were the Diet Supp found to be separable from the trademarked fran-

---

6. The Fourth Circuit used a somewhat analogous approach to reach the same result in *Principe, supra* note 5, 631 F.2d at 309, which held a license to use McDonald's trademark and food preparation system inseparable from the required leasing of particular store premises:

 Given the realities of modern franchising, we think the proper inquiry is not whether the allegedly tied products are associated in the public mind with the franchisor's trademark, but whether they are integral components of the business method being franchised. Where the challenged aggregation is an essential ingredient of the franchised system's formula for success, there is but a single product and no tie-in exists as a matter of law.

7. In the absence of disputed material facts, the issue of separateness is properly decided on summary judgment. *See Krehl, supra; Hamro, supra. Cf. California Glazed Products, supra.*

8. The analysis of tying agreements has at times been muddled by the injection of an additional requirement that plaintiff prove "coercion." In *Moore, supra,* for example, the court held that "there must be some modicum of coercion shown," 550 F.2d at 1216. It went on to find that the necessary coercion could be inferred from a showing than an appreciable number of buyers had accepted burdensome terms and defendant possessed sufficient economic power in the tying product. *See also, Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343, 1347 (9th Cir.), *cert. denied,* 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982).

 The Supreme Court in *Hyde* has made it clear that coercion, i.e. forcing, is simply a manifestation of market power.

chise, the tie of one product to another is per se illegal only if the seller possesses sufficient market power in the tying product to appreciably restrain trade in the tied product. In confirming the survival of a per se rule against tying, *Hyde* restricted its applicability to cases where "the existence of forcing is probable," 104 S.Ct. at 1560. *See also Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Systems, Inc.,* 732 F.2d 1403, 1407 (9th Cir.1984).[9] The Court cited patents, high market share, and the unique character of a product competitors are unable to offer as sources of market power that make forcing likely, *id.* at 1560–61. But in the absence of "the degree or the kind of market power that enables [a seller] to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market.... Any inquiry into the validity of the tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact." *Id.* at 1561. Thus, following the reasoning in *Hyde,* the analysis here must focus on Diet Center, Inc.'s, sale of franchises to franchisees (and subfranchisees) for that is the market in which

the tying and tied products are sold and in which any anticompetitive effect would arise.

The parties have provided little evidence concerning this market, having instead directed the Court's attention to the retail market in which the franchisees' services are sold to clients. Although that market is not the one relevant to the resolution of the tying issue in this action, the evidence offered illuminates Diet Center's position in the relevant market.

Both parties agree that franchisees compete at the retail level in what they call the service-assisted weight-loss program market, distinguished from a broader market that might include, for example, self-help methods of weight loss such as diet books and appetite suppressants. Plaintiffs posit the existence, however, of a submarket consisting of high-priced individual-counseling diet-related weight loss programs. That market is principally defined by price: plaintiffs claim that customers for such programs pay $30 per week and up, compared to $5 per week for non-individualized services. Given such price differentials and the availability of both kinds of services from single companies, they argue that there are distinct customer groups.

**9.** Application of the "forcing" concept confronts courts with a dilemma. Obviously a seller must have some degree of leverage or power to require buyers to accept the condition of having to purchase the tied product: if buyers always purchased the product voluntarily, the condition would be unnecessary. But if that leverage or power alone suffices to establish the presence of forcing and thus to evoke the per se rule, then every tying agreement would ipso facto be illegal per se. Such a result is clearly not what *Hyde* or earlier Supreme Court decisions intended. First, in the absence of a degree of market power sufficient to raise an issue under Section 2 of the Sherman Act, a tying agreement, from the perspective of a defendant's competitor, is tantamount to a requirements contract subject to scrutiny under the rule of reason, 104 S.Ct. at 1568 n. 51. From the buyer's point of view, the tie resembles a non-price vertical restraint subject to the rule of reason under *GTE Sylvania, supra* note 5. Second, had the Court intended otherwise, the analysis in *Hyde* of competitive conditions in the tying product market would have been superfluous.

At base, "forcing" a buyer to accept a tie-in does not differ from "forcing" him to pay a particular purchase price. The seller simply takes part of the price for the tying product in the form of forced purchases of the tied product. To the buyer, the controlling consideration remains the aggregate price of the package. The *anti-tying prohibition is aimed not at such* market devices in general but at the unlawful use of market power to unreasonably restrain trade or to monopolize. As the Court stated in *Hyde,*

> Of course, the Sherman Act does not prohibit "tying," it prohibits "contracts ... in restraint of trade." Thus, in a sense the question of whether this case involves "tying" is beside the point. The legality of petitioners' conduct depends on its competitive consequences, not whether it can be labeled "tying." If the competitive consequences of this arrangement are not those to which the per se rule is addressed, then it should not be condemned irrespective of its label.

104 S.Ct. at 1563 n. 34.

██ The evidence submitted by plaintiffs is not sufficient to establish the existence of a submarket at the retail level. It is far too generalized and vague to fix any comprehensible line of demarcation. Market definitions based on price levels, moreover, have not found favor with courts. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) ("medium priced" shoes found to compete with "low priced" shoes); *United States v. Jos. Schlitz Brewing Co.*, 253 F.Supp. 129 (N.D.Cal.), *aff'd per curiam*, 385 U.S. 37, 87 S.Ct. 240, 17 L.Ed.2d 35 (1966) (premium and non-premium beers not separate lines of commerce). Further, to find a distinct submarket based on price requires detailed consideration of other factors such as the precise contours of the alleged submarket, the spread of price levels throughout the market, the degree of price overlap, cross-elasticity of demand and price sensitivity. *See JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 509 F.Supp. 357, 373–75 (N.D.Cal.1981), *aff'd*, 698 F.2d 1011 (9th Cir.1983). Virtually no evidence has been offered on these points.

Even if price levels were found to suggest a high-end submarket at the retail level, there is nothing before the Court to indicate the existence of a comparable submarket in the market where franchises are sold. There is no reason to suppose a priori that different weight loss program franchises are not "reasonably interchangeable by [franchisees] for the same purposes," *United States v. E.I. Du Pont & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The retail price of the product is only one factor that might bear on potential franchisees' decisions: others include the cost of the franchise, the quality of the product or service franchised, the demonstrated goodwill among consumers, and profit potential. Nothing before the Court affords a basis for narrowing the market beyond the definition the parties agree on, the nation-wide service-assisted weight-loss market.

The inquiry then becomes whether Diet Center, Inc., possesses the requisite power in that market to support application of the per se rule. To begin with, plaintiffs allege none of the factors on which the Ninth Circuit recently relied in *Data General, supra* note 2, to find that defendant computer manufacturer possessed sufficient market power in the tying product market to foreclose competition in the tied product market.[10] There the tying product, a computer software program, was unique among competing products and could not be reproduced without infringing defendant's copyright or utilizing its trade secrets. Creation of a comparable system was conceded to be economically infeasible. Moreover, the court found many of defendant's customers to be "locked in" to use of defendant's tying product by their substantial investment in compatible application software. No such evidence is offered here. Diet Center's competitors are not prevented from developing or offering a comparable diet program. Plaintiff alleges no patent, copyright or monopoly power of any sort. Defendants' franchisees are not "locked in" to the tying product by substantial investment; indeed, the initial franchising fee is conceded to be refundable. Nor are there technological barriers even remotely analogous to those the court found dispositive in *Data General*.

Plaintiffs argue that Diet Center, Inc., wields market power solely by virtue of its trademark which is alleged to render the Diet Center franchise sufficiently unique to enable defendants to impose burdensome conditions. *Data General*, in dicta, quoted with approval from the Fifth Circuit's decision in *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 48 (5th Cir.1976), a trademark tying case:

> [u]niqueness, of course, presupposes that competitors are in some way foreclosed from offering the distinctive product. *Fortner* points out [394 U.S.] at 505, 89 S.Ct. 1252 [at 1259] note 2, that such barriers may be legal, as in the cases of

**10.** It is important to note that *Data General* was an action brought by a competing seller, not by a customer as is the case here. The appropriate market analysis will not necessarily be the same in both types of cases. See also the discussion in parts IV and V, below.

patented or copyrighted products. Trademarks surely may be included in the list of such legal restraints, and, as with copyrighted material, the mere presence of competing substitutes is insufficient to destroy the legal, and more importantly the economic, distinctiveness of the trademark.

But *Carpa* made clear that a trademark, unlike a patent or copyright, is not automatically presumed to confer market power. The *Carpa* opinion goes on to state in the paragraph after that quoted above:

Neither the Supreme Court, nor this Circuit, has gone so far as to presume that the mere existence of a trademark in and of itself supplies economic power sufficient to constitute an antitrust violation. Unlike a patent or copyright which is designed to protect the uniqueness of the product or process itself, a trademark protects only the name or symbol of the product. This is a basic conceptual difference.... We adhere to the principle applied by the Supreme Court in *Fortner, supra:* "The proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." 394 U.S. at 504, 89 S.Ct. at 1259.[11]

To establish that power, plaintiffs rely primarily on Diet Center's market share. But in the market the Court has determined to be relevant, that of service-assisted weight-loss operations, plaintiffs calculate Diet Center's share at 19%; defendants contend that it is only 13–15%. Thus Diet Center's share of the relevant market is substantially lower than the market shares of defendants in both *Hyde* and *Times-Picayune* which were held insufficient to confer market power.

Additional factors support the conclusion that defendants do not possess market power. Plaintiffs concede that there are no significant barriers to entry in the tying product market. Their evidence shows that Diet Center's initial franchising fee

and royalties are lower than those charged by many of its competitors and that Diet Center's share of the service-assisted weight-loss franchise market declined from 1980 to 1982. Finally, it is not disputed that Diet Center's franchise charges declined in constant dollars over the same time period.

The evidence thus establishes that Diet Center, Inc., lacks the requisite market power sufficient to sustain a finding that it forced franchisees to make unwanted purchases of Diet Supp.

It should be noted that even if Diet Center, Inc., possessed some measure of market power, this is not a case warranting relief against a tying arrangement on the ground that it could "increase [ ] the social costs ... [by] facilitat[ing] price discrimination." *Hyde,* 104 S.Ct. at 1567, n. 47. In theory, "[w]here the quantity of sales of the tied product operates as a measure of the buyer's intensity of use of the tying product, the seller may exact a premium from the more intensive users by charging supracompetitive prices for the tied product." *Hirsh, supra* note 8, 674 F.2d at 1349. Assuming the price charged for the Diet Supp to be supracompetitive, the tie enables Diet Center, Inc., to collect more from those franchisees who are more intensive users of the franchise and thus value it more highly than the less intensive users. *See Fortner I,* 394 U.S. at 513 n. 7, 89 S.Ct. at 1264 n. 7 (J. White dissenting) (tying arrangements "may be used as a counting device to effect price discrimination"); *Moore,* 550 F.2d at 1213 ("importance of tie-ins as a means of price discrimination"); *see generally* W. Bowman, *Tying Arrangements and the Leverage Problem,* 67 Yale L.J. 19, 23 (1957).

█ Price discrimination as such, of course, is unlawful only if it violates the Robinson Patman Act, 15 U.S.C. § 13, which requires a showing of lessened competition or tendency toward monopoly. No

---

11. *See also Copperweld Corp. v. Independence Tube Corp.,* — U.S. —, — n. 19, 104 S.Ct. 2731, 2743 n. 19, 81 L.Ed.2d 628 (1984): "Market power is the ability to raise prices above those that would be charged in a competitive market."

such claim is made here. Nevertheless price discrimination through tying agreements when it could not otherwise have been accomplished (usually by way of variable-quantity purchasing) has been criticized by some courts, *see, e.g., Hirsh, supra,* although commentators disagree on whether it is economically harmful.[12]

■ For two reasons, price discrimination is not a basis for condemning the Diet Center arrangement. First, it is not a device to evade price control or restraint. *See Hyde,* 104 S.Ct. 1567, n. 47. Second, Diet Center, Inc., could achieve the same result by charging a variable royalty based on a percentage of revenue, *see Siegel,* 448 F.2d at 50 (royalties based on sales volume are a "feasible alternative method of compensation"), and thereby extract the consumer surplus from intensive users of the franchise.

There are various unobjectionable reasons why Diet Center, Inc., might prefer to employ a tying rather than a royalty arrangement.[13] But price discrimination does not create anticompetitive consequences merely because it is achieved by one means rather than another. *See 2 P. Areeda & D. Turner Antitrust Law* ¶ 347b (1978). Absent proof that Diet Center franchisees were competitively damaged (other than by Diet Center, Inc.'s, decision to employ what amounts to a royalty scheme) plaintiffs fail to establish that Diet Center, Inc., has "increased the social costs of its market power."

The Court concludes, therefore, that plaintiffs have failed to demonstrate the existence of market power sufficient to invoke the per se rule. There is no evidence which could support a finding that Diet Center, Inc., is able to impose unreasonable terms on buyers in the relevant market. In the absence of any disputed material facts, defendants are entitled to summary judgment on this issue.

### IV. *Is the Arrangement an Unreasonable Restraint of Trade?*

■ In the absence of per se liability, plaintiffs bear the burden of proving that the purchase requirement violates the Sherman Act because it unreasonably restrained trade. That burden involves an inquiry into the effect of Diet Center, Inc.'s, requirement that its franchisees purchase its Diet Supp on competition among suppliers of Diet Supp or its equivalents. *Hyde,* 104 S.Ct. at 1567.

■ Plaintiffs have offered no evidence defining the relevant market or bearing on the effect of the Diet Center, Inc., arrangement on competing suppliers. The only evidence plaintiffs have offered concerns the allegedly lower prices charged for alternative diet supplements from other suppliers. That evidence is not probative of a restraint of trade. There is no indication that the Diet Center, Inc., arrangement had any effect on competition among suppliers or on consumer demand for diet supplements.

As the Court stated in *Hyde,*

> [w]ithout a showing of actual adverse effect on competition, [plaintiff] cannot make out a case under the antitrust laws, and no such showing has been made.

104 S.Ct. at 1568. Plaintiffs have failed to show anything other than that possibly comparable diet supplements (which may or may not secure Diet Center, Inc.'s, requisite approval under the franchise agreement) could be purchased for less. They have come forward with no evidence that competition has been adversely affected. *See also Robert's, supra,* 732 F.2d at 1408 ("injury to the antitrust plaintiff alone is not sufficient to prove injury to competition").

---

12. *Compare* R.S. Markovits, *Tie-Ins and Reciprocity: A Functional, Legal, and Policy Analysis,* 58 Tex.L.Rev. 1363, 1378–81 (1980), *with* R. Posner, *Exclusionary Practices and the Antitrust Laws,* 41 U.Chi.L.Rev. 506, 508–15 (1974).

13. Tying arrangements may, for example, enable a franchisor to obtain more efficiently accountings of the volume of its franchisees' business. *See also* note 5, *supra.*

### V. *Even if the Diet Center Franchise Were Held to be an Unlawful Tie-in, Could Plaintiffs Establish Damage?*

█ In addition to establishing the existence of an illegal tying arrangement, plaintiffs seeking to assert a claim under Section 1 must also demonstrate "actual injury ... causally linked to defendants' antitrust violation," *In re Data General Corp. Antitrust Litigation*, 490 F.Supp. 1089, 1101 (N.D.Cal.1980), *rev'd on other grounds, Data General, supra; Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 230–31, 233 (9th Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). "One of the essential elements for recovery under the antitrust law is that the claimant be injured or damaged," *Gray v. Shell Oil Co.*, 469 F.2d 742, 748 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); absent injury, "a private person has no right to complain of a violation of §§ 1 and 2 [of the Sherman Act]," *Winckler v. Smith Products Co. v. Sunkist Growers*, 346 F.2d 1012, 1014 n. 1 (9th Cir.), *cert. denied*, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). A plaintiff who fails to adduce evidence of injury is not entitled to have his claim submitted to the jury, *see Gray*, 469 F.2d at 749. Moreover, 15 U.S.C. § 26 provides for private injunctive relief solely "against threatened loss or damage by a violation of the antitrust laws"; a finding of the possibility of future injury is thus as much a prerequisite for enjoining a tying arrangement as one of prior injury is for awarding treble damages.[14]

█ The franchisee alleging an illegal tie to the franchised trademark does not meet his burden of proving the injury necessary to recover under Section 1 merely by establishing that he paid an inflated or noncompetitive price for the *tied* product. As the Ninth Circuit held in *Siegel*, 448 F.2d at 52, where plaintiff franchisees claimed to have been damaged by the supracompetitive price of certain products necessarily purchased from defendant franchisor,

> to ascertain whether an unlawful arrangement for the sale of products has caused injury to the purchaser, the cost or value of [both the tying and the tied] products involved, free from the unlawful arrangement, must first be ascertained.

In other words, a party to a tying arrangement has not suffered economic harm from the inflated price of the *tied* product where the seller might simply have reduced that price to a "competitive level" and correspondingly increased the price of the *tying* product. Thus, to demonstrate the injury necessary to establish defendant's liability, plaintiff must prove that the payment for both the tied and tying product exceeded their combined fair market value.[15]

*Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir.), *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982), for example, affirmed summary judgment in favor of defendant fast-food franchisor alleged to have tied its franchised trademark to the lease of restaurant premises. The Court held that the requirement of injury set forth in *Siegel* had not been satisfied both because plaintiff could not establish his ability to secure alternative premises of comparable potential profitability and because he introduced no evidence "that he was charged more than the reasonable value of his lease and license," *id.* at 1286. Although the court acknowledged that *Siegel* had remanded on the issue of the fair market value of the combined products, it found no need to do so

---

**14.** The damage requirement may differ, of course, depending on whether plaintiff is a buyer forced to purchase the tied product or a competitor allegedly foreclosed from the tied product market. *See Ungar, supra* note 4, 531 F.2d at 1221, n. 7a.

**15.** The Supreme Court has at least suggested its accordance with this analysis. In *Fortner II,*

*supra,* the court rejected an inference of market power based on the existence of the tie itself by noting that

> proof that Fortner paid a higher price for the tied product is consistent with the possibility that the financing [the tying product] was unusually inexpensive and that the price for the entire package was equal to, or below, a competitive price.

**1572**

where plaintiff had "conceded his inability to offer any evidence regarding this essential point," *id.*

In the case at bench, plaintiffs rely on two facts to establish that the payments for the franchised trademark and for the Diet Supp exceed the two products' combined market value. First, they contend that while Diet Center sells its Diet Supp at forty-five cents per dieter per day, the same quantity of supplements can be purchased elsewhere for twenty-five to thirty cents. Second, they claim that Diet Center's continuing license fee, effectively a royalty based on a percentage of revenues, exceeds the royalty payments charged by Nutri/System, Diet Center's closest competitor in the weight-control market. According to plaintiffs' calculations, subtracting the forty-five cent payment for Diet Supps from the continuing license fee charged per dieter, Diet Center subfranchisors pay an average of 11.5% of revenues solely for their license and subfranchisees pay an average of 19.3% of revenues. Nutri/System, by contrast, allegedly charges its franchisees only 7% of revenues, 200% less than Diet Center subfranchisees are charged.

Accepting plaintiffs' calculations for purposes of this motion, the issue is whether proof that Diet Center's royalty exceeds those of competing franchisors establishes the cost of the Diet Center franchise package to be supracompetitive, as required by *Siegel,* and hence a basis for antitrust damage. Different franchises possess different attributes and accordingly different degrees of appeal to potential franchisees. Some may have special pricing schemes, others may market a particularly sought after product, and still others may offer an unusually complete package enabling franchisees to commence operations with a minimum of knowhow or financial resources. The price charged by a franchisor reflects the value franchisees in the market attach to the package he offers: a franchisor who charges a price higher than the market is

willing to pay will not long survive. To find that the price of one package is noncompetitive solely because it is different from the price of another is to assume products to be fungible when the marketplace clearly establishes that they are not.

Moreover plaintiffs' reliance on Diet Center's 19.6% royalty to demonstrate noncompetitiveness ignores the fact that different franchises collect revenue in different ways. Accepting plaintiffs' calculation of Nutri/System's royalty at 7% and thus lower than Diet Center's as calculated by plaintiffs, the fact remains that Nutri/System's initial franchising fee is substantially higher than Diet Center's. A franchisee opening a Nutri/System outlet must immediately lay out $49,500 while his Diet Center counterpart pays an initial fee of only $24,000, about half as much. Thus the allegedly inflated royalty payments do not establish that plaintiffs paid more for the franchise package than its fair market value; they are simply an alternative to a higher initial investment requirement.[16]

In addition there are significant distinctions between other aspects of the Diet Center and Nutri/System franchises which render direct price comparisons unmeaningful. It appears from the evidence that Diet Center provides its franchisees with financing which is unavailable from Nutri/System, and Diet Center's initial franchising fee is, to a limited extent, refundable when a franchisee desires to withdraw from the operation. Furthermore, while Nutri/System derives approximately 80% of its revenue from a 27% gross margin on food items "purchased at wholesale from the company by the franchisees for resale to clients," (Plf.Ex. PPP), Diet Center's revenues are substantially less dependent on sale to franchisees of items not part of the franchise package.

Comparison of royalty fees charged by other franchisors, therefore, does not tend to prove the fair market value of the Diet

16. In fact, the compilation from which plaintiffs have drawn their pricing information estimated the "Range of Capital Needed" for setting up a Nutri/System franchise at $65,000–95,000 and a

Diet Center franchise at $15,000–30,000. Moreover, of the 26 weight control franchises surveyed, Diet Center had among the lowest ranges of capital required.

Center franchise. Rather, as Areeda and Turner have stated, the most accurate method of determining the combined market value of the tied and tying products is "by reference to what franchisees have demonstrated a willingness to pay." 2 *P. Areeda & D. Turner, Antitrust Law,* § 347b (1978). *See also, Ungar, supra,* 531 F.2d at 1223 & n. 10. Potential franchisees who are free to choose a franchise will not, by definition, pay a higher price for a franchise than its market value, and there is no contention here that they are constrained in selecting from among a variety of weight control franchises.

Moreover, this is not a case in which the pricing scheme employed by the franchisor somehow disguises the cost of the franchise. In *Siegel,* for example, the Court found that the willingness of the plaintiffs to purchase the tied equipment, spices, and paper goods at inflated prices did not establish the competitiveness of the combined package price because franchisees may well have been unaware of what that cost would

> come to in practice. Had the full amount of the overcharge on the tied items been openly specified as the cost of the tying items agreement might not have been forthcoming. We can hardly rule as a matter of law that it would have been.

448 F.2d at 52–53. The court's concern was not that an initial franchisee would always be unable to predict its eventual costs solely because they would vary with the volume of business, an inevitable characteristic of all royalty arrangements. Rather, the court worried that a franchisee might not realize what the "cost of the arrangement ... would come to" because

his entire payment depended on his eventual and unpredictable requirements of the tied products. The true cost of the franchise in *Siegel* could be considered "buried": franchisees paid no royalty or license fee whatsoever and were charged only for products like equipment, ingredients and paper products whose costs as a function of revenue inexperienced franchisees might find difficult to calculate at the outset of the enterprise.

This danger is absent where, as here, the costs of the franchise are "openly specified." Diet Center franchisees know exactly what their cost per customer (i.e. the "cost of the arrangement") will be from the outset; not only are they charged a set license fee per customer but the amount of Diet Supp they must purchase per customer is fixed. Franchisees can predict the eventual price per customer as accurately as if the cost of the Diet Supp had been recharacterized as part of the licensing cost.[17]

■ In sum, bare comparison of the royalties charged for other franchises cannot establish the non-competitiveness of the package price charged by Diet Center absent proof that the initial price of the arrangement was somehow disguised. As *Siegel* indicated, 448 F.2d at 52 n. 11, franchisees will thus rarely be able to establish injury from a tying arrangement because the price paid is usually conclusive proof of the franchise package's fair market value. Restricting the class of persons who can sue for an allegedly illegal tie to those who suffer demonstrable injury, however, does not immunize conduct violative of the antitrust laws. The franchisor who illegally

---

**17.** A franchisee may still be able to prove injury if the illegal tie coerces him to buy products or services which are unwanted or of unexpectedly inferior quality causing him to lose customers and revenue. He will thus be able to establish damage arising not from the allegedly anticompetitive price of the package for which he bargained but from the excess cost or inferiority of items which he has no choice but to continue purchasing. *Cf. Roberts, supra.* In *Roberts,* the Court held that defendant franchisor could not, absent justification, tie its trademark to the use of a particular bookkeeping service which plaintiff franchisee complained was incompetent.

Although the Court of Appeals did not address the damage issue, plaintiff in *Roberts* might have established injury arising from the unexpectedly poor quality, and thus cost, of the bookkeeping service which he was required to use.

Plaintiffs here do not claim that they were damaged because the Diet Supp they were required to purchase was unwanted, hurt their business or was in any way unsatisfactory. On the contrary, they concede that the Diet Supp is effective and important to the weight-loss program. They merely desire to buy it elsewhere.

ties separate products to his trademark may still be subject to challenge not only by the government but also by potential compétitors in the tied product market who can establish market foreclosure generated by the tying arrangement.

### CONCLUSION

For the reasons stated, defendants' motion for partial summary judgment on the tying claim is granted and plaintiffs' motion is denied.

The parties are directed to appear at a status conference on August 10, 1984, at 10 a.m. to discuss the disposition of the remaining claims.

IT IS SO ORDERED.