CHEM–TEK, INC., Plaintiff,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. 3:92CV320 (PCD).

United States District Court, D. Connecticut.

March 8, 1993.

---

Robert J. Sweeney, Sklarz, Early & Avallone, P.C., New Haven, CT, for plaintiff.

Lawrence S. Buonomo, Bingham, Dana & Gould, Street, Boston, MA and Ben M. Krowicki, Bingham, Dana & Gould, Hartford, CT, for defendant.

## RULING ON MOTION TO DISMISS

DORSEY, District Judge.

Plaintiff ("Chem–Tek") brings this action against General Motors ("GM") alleging violations of the Connecticut Franchise Act and the Connecticut Unfair Trade Practices Act, as well as tortious interference with a business expectancy, breach of contract, and promissory estoppel.

*Facts*

Chem–Tek manufactures vehicle protection products such as paint sealant, fabric protector, rust proofing, paint sealant cleaner, glass etchant, undercoating, and joint and seam sealant. GM is a multi-faceted corporation with a world-wide network of car dealers and distributors. Chem–Tek alleges that between 1985 and 1991, an agreement between Chem–Tek and GM arose from oral and written representations and a long-established course of dealing.

Pursuant to this alleged agreement:

1) GM granted Chem–Tek the right to engage in the business of offering, selling or distributing vehicle protection products under the "GM Goodwrench" and "AC Delco" trademarks. Complaint at 2.

2) At GM's encouragement and direction, Chem–Tek engaged representatives to solicit orders for these products from the GM network. Complaint at 3.

3) GM was authorized to interview and approve all sales and marketing personnel, and to require Chem–Tek to terminate any such personnel. Complaint at 9.

4) GM reimbursed the salaries and some sales and marketing personnel expenses. *Complaint at 6.*

5) GM established application instructions and performance standards, tested and approved the products to be offered, sold or distributed. Complaint at 7.

6) GM endorsed the products as safe and effective and encouraged its network to purchase them. Complaint at 4.

7) At GM's encouragement and direction, Chem–Tek's representatives identified themselves to the network as authorized representatives, sellers, manufacturers and distributors of GM Goodwrench and AC Delco products. Complaint at 4.

8) GM produced, organized and paid for meetings and conferences to promote Chem–Tek's products. Chem–Tek's representatives were identified at these meetings as authorized representatives, sellers, manufacturers and distributors of GM

Goodwrench and AC Delco products. Complaint at 4.

9) GM approved, produced and paid for advertising and promotional materials identifying Chem–Tek products as GM Goodwrench and AC Delco products. Complaint at 5.

10) At GM's encouragement and direction, Chem–Tek's employees and representatives used letterhead and business cards with GM trademarks and logotypes. Complaint at 5.

11) Chem–Tek had access to GM's computer system to aid in offering, selling or distributing GM Goodwrench and AC Delco products. Complaint at 7.

12) GM set prices for GM Goodwrench and AC Delco products. Complaint at 8.

13) Chem–Tek shipped orders directly to GM's network, collected payment, and remitted a portion to GM. Complaint at 8.

14) GM prohibited Chem–Tek from offering, selling or distributing any competing products to the GM network. Complaint at 9.

15) During 1991–1993, Chem–Tek participated in GM's cost reduction program. Complaint at 8.

On December 23, 1991, without notice or good cause, GM terminated the Chem–Tek agreement and informed its network that it had elected to discontinue the sale of GM Goodwrench and AC Delco vehicle protection products. Complaint at 11, 15.

*Discussion*

■ A motion to dismiss under Rule 12(b)(6) must be decided solely on the facts alleged. *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985). Such motion should be granted only where no set of facts consistent with the allegations could be proven which entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The issue is not whether the plaintiff will prevail, but whether the plaintiff should be afforded the opportunity to offer evidence to prove the claims. *Id.*

1. Chem–Tek alleges that the bulletins misrepresented the nature of Chem–Tek's relationship

**I.** *The Scope of Review on a Motion to Dismiss*

GM argues that the Chem–Tek agreement was not a franchise, but a terminable-at-will agreement for the sale of goods. GM attached a purchase order and two "parts and accessories information bulletins" to its motion. When "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b)(6). The parties must be given an opportunity to present all pertinent materials. *Id.*

■ When a complaint attaches an exhibit, or incorporates a document by reference, however, the complaint is deemed to include such documents. *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); *Goldman v. Belden,* 754 F.2d at 1065–66. Additionally, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim." *Id.* at 47, citing *I. Meyer Pincus & Assoc. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991). A plaintiff's reliance on a document eliminates the need to consider a Rule 12(b)(6) motion under Rule 56. *Id* at 48.

The complaint references the parts and accessories information bulletins. Complaint at 15. Further, Chem–Tek relied upon these bulletins as an integral element of its claim for tortious interference with a business expectancy.[1] The bulletins, therefore, are properly considered on the motion to dismiss. The purchase order is not referenced in the complaint. Although Chem–Tek does not dispute having notice of the purchase order, plaintiff's claims are not based solely on the written document, but also on words, conduct and other documentation. *Cf. I. Meyer Pin-*

with GM.

*cus & Assoc.,* 936 F.2d at 762 (where claims were based only on an alleged written misrepresentation appearing within the prospectus and not in any other source).

Chem–Tek emphasizes that its agreement arose from a series of documents, oral representations and a long-established course of conduct.[2] Chem–Tek did not rely on the purchase order in the sense required by *I. Meyer Pincus & Assoc., supra* and *Cortec Industries, supra.* Thus, the purchase order is outside the scope of review on a motion to dismiss.

## II. *Connecticut Franchise Act*

Chem–Tek alleges that GM's termination violates the Connecticut Franchise Act ("the Act") because a franchise may not be terminated except for good cause shown and upon sixty days notice. Conn.Gen.Stat. § 42–133f(a). GM argues that the Act is inapplicable because: 1) the agreement is not a franchise as defined by the Act; and, 2) a fortuitous presence in Connecticut does not satisfy the Act's requirement that the franchisee establish a business in Connecticut.

### A. *A Franchise as Defined by the Act*

A franchise is an oral or written agreement under which: 1) the franchisee[3] is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan prescribed in substantial part by the franchisor;[4] and 2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark or other commercial symbol designating the franchisor or its affiliate. Conn.Gen. Stat. § 42–133e. The first element requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute

goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services.

1. *The Right to Engage in the Business of Offering, Selling or Distributing Goods or Services*

The Connecticut courts have not addressed the contours of a right to engage in the business of offering, selling or distributing goods or services. In addressing this question, a federal court sitting in diversity must best assess how a Connecticut court would interpret and apply the language of the statute. *Bailey Employment System, Inc. v. Hahn v. Leighton,* 655 F.2d 473, 477 (2d Cir.1981). The statute is remedial and must be liberally construed in favor of the protected class. *Hartford Fire Ins. Co. v. Brown,* 164 Conn. 497, 503, 325 A.2d 228 (1973).

Two district courts in diversity have addressed the meaning of a right to offer, sell or distribute products or services under the Connecticut Franchise Act. An independent contractor has been held not to have the right to offer, sell or distribute when it only had authority to solicit orders for acceptance or rejection by the manufacturer, but not to create a binding contract of sale. *George R. Darche Assoc. v. Beatrice Foods, Co.,* 538 F.Supp. 429, 434 (D.N.J.1981), *aff'd,* 676 F.2d 685 (3d Cir.1982). The Act was held not to apply to a parent-subsidiary relationship as "the Act does seem to contemplate that a franchisee take title to goods, since one provision of the Act refers to inventories, supplies and equipment purchased from the franchisor." *Jenkins v. Haworth,* 572 F.Supp. 591, 600 (W.D.Mich.1983) (citing

---

2. For the purposes of this motion, the allegations of the complaint are accepted as true.

3. A franchisee is defined as "a person to whom a franchise is granted, including a distributor, wholesaler or jobber or retailer who is granted the authority under a franchise to use a trademark, tradename, service mark or other identifying symbol or name." Conn.Gen.Stat. § 42–133e(d).

4. A franchisor is defined as "a person who grants a franchise to another person, including a manufacturer, refiner or producer or a distributor, wholesaler or jobber who grants to a distributor, wholesaler or jobber or retailer, as the case may be, the authority to use a trademark, tradename, service mark or other identifying symbol or name under a franchise." Conn.Gen.Stat. § 42–133e(c).

Conn.Gen.Stat. § 42–133f).[5] The defendant in that case has actually argued that "in order to come within the protections of the Act, the alleged franchisee must pass title to goods rather than just solicit sales." *Id.*

These interpretations are substantially different. The Michigan district court would require that a franchisee purchase goods from the franchisor for resale under the franchisor's trademark. The New Jersey District Court would require only that the franchisee have the authority to commit the franchisor to a binding contract of sale.

Although § 42–133f(c) does contemplate that the franchisee take title to goods, it only pertains to a remedy for the specific situation[6] in which a franchisee has purchased supplies, equipment and furnishings from the franchisor and possesses them at the time of termination. The remedy thus provided protects a franchise from being stuck with a useless inventory at termination. It is § 42–133e that defines a franchise and the relationships which fall within the remedial provisions of § 42–133f and § 42–133g.

■ The language of § 42–133e is inclusive.[7] The definitions do not exclude from the Act a manufacturer, like Chem–Tek, that offers, sells or distributes its products under another's trademark. The definitions do not require that a franchisor convey goods to the franchisee for resale under the franchisor's trademark.[8] Rather, what is required is the right to offer, sell or distribute goods under the franchisor's trademark. There is no specification of who is to convey title to the goods.

The language of the statute is purposefully general. "The generality ... is obviously necessary because of the many circumstances to be encountered by any court in reaching the determination of the relationship of franchise." Richard W. Farrell, *Franchising in Connecticut—"Can Anybody Here Play This Game?"* 54 Conn. B.J. 446, 457 (1980). The many structures employed to move products through the channels of trade, the statute's remedial purpose, and the generality of the statutory language preclude a narrow construction of the Act's applicability. Accordingly, the authority to convey title to goods under the franchisor's trademark or other commercial symbol is sufficient to constitute a "right to engage in the business of offering, selling or distributing products or services." Conn.Gen.Stat. § 42–133e.

GM argues that it employed Chem–Tek to *manufacture* products under the GM trademark only. Chem–Tek argues that GM granted it the authority to manufacture *and* to offer, sell or distribute the products in return for a portion of the purchase price set by GM. The dispute, essentially whether it was GM or Chem–Tek that was "selling" the products to the GM network, and thus over who had the authority to convey title to the goods, cannot be resolved on the pleadings.

2. *A Marketing Plan*

■ The Act focuses on the amount of control exercised in the conduct of the fran-

---

5. The pertinent provision of § 42–133f provides that: "Upon termination of any franchise the franchisee shall be allowed fair and reasonable compensation by the franchisor for the franchisee's inventory, supplies, equipment and furnishings purchased by the franchisee from the franchisor or its approved sources under the terms of the franchise or any ancillary or collateral agreement; provided no compensation shall be allowed for personalized items which have no value to the franchisor." Conn.Gen.Stat. § 42–133f(c).

6. As the court in *Darche Assoc., supra* recognized: "There are many methods of marketing and distribution to move products from manufacturer to ultimate consumer, and a wide variety of channels through which this trade is carried on.... There are countless arrangements and combinations." *Darche Assoc.*, 538 F.Supp. at 431–32.

7. *See* §§ 42–133e(c), (d); *See also, supra* notes 3 and 4.

8. Note also that the statute reads "offer, sell or distribute," suggesting support for the interpretation contemplated by the New Jersey District Court in *Darche Assoc., supra.* This court need not decide, however, whether a right to commit the franchisor to a binding contract of sale is sufficient to constitute a "right to engage in the business of offering, selling, or distributing goods or services," Conn.Gen.Stat. § 42–133e. Chem–Tek's claim is based on the theory that it, rather than GM, had the authority to convey title to the "GM Goodwrench" and "AC Delco" vehicle protection products.

chisee's business as a significant factor in whether a franchise was created. *M & S Audio, Inc. v. Bogen Communications, Inc.,* 1992 WL 231459 (Conn.Super.Ct.) Thus, a franchisor must be able to prescribe in substantial part a marketing plan for the franchisee. Conn.Gen.Stat. § 42–133e. Several factors relevant to this determination include: control over hours and days of operation, advertising, financial support, auditing of books, inspection of premises, control over lighting, employee uniforms, prices, trading stamps, hiring, sales quotas and management training. *Consumers Petroleum of Connecticut, Inc. v. Duhan,* 38 Conn.Supp. 495, 498–99, 452 A.2d 123 (1982). "There is no such precise formula as to how many of such factors must exist, in the aggregate, before the control exercised by a manufacturer rises to a marketing plan or system prescribed in substantial part by a franchisor." *Sorisio v. Lenox,* 701 F.Supp. 950 (D.Conn.1988), *aff'd,* 863 F.2d 195 (2d Cir.1988).

■ Chem–Tek alleges sufficient indicia of control to withstand GM's motion to dismiss. Specifically, Chem–Tek alleges that GM directed the employment of marketing personnel and retained authority to approve or direct their termination. GM provided financial assistance through reimbursement of personnel salaries and expenses, advertising and promotional materials, and the organization of marketing conferences. GM set the purchase price for the products. GM prohibited Chem–Tek from offering any competing products to the GM network. Chem–Tek must be permitted to offer evidence to prove these allegations. If successful, it should prevail.

### 3. Substantial Association with the Franchisor's Trademark

■ The requirement that the conduct of the franchisee's business be substantially associated with the franchisor's trademark does not require exclusivity. *Grand Light & Supply Co. v. Honeywell, Inc.,* 771 F.2d 672 (2d Cir.1985). "Where the franchisee is completely dependent on the public's confidence in the franchised product for most or all of his business, abrupt severance of the franchise tie, without good cause and without

sufficient notice, could spell ruination." *Id.* at 677. The franchisee must be sufficiently dependent on the franchisor that termination would be not only harmful, but disastrous.

Chem–Tek alleges substantial association with the "GM Goodwrench" and "AC Delco" trademarks. The trademarks impliedly guaranty the quality of the products. Indeed, GM's performance standards and testing could only have been calculated to insure the quality of all products before offer, sale or distribution. Chem–Tek's representatives' identification as authorized representatives, sellers, manufacturers, and distributors of GM products, and their use of letterhead and business cards with GM trademarks and logotypes served to identify them with GM. Chem–Tek also alleges that although it manufactures other vehicle protection products, the GM trademark products represented the substantial part of its business. Chem–Tek is entitled to show that the abrupt termination had a disastrous effect on its business.

### B. Presence In Connecticut

■ The Act applies "only to franchise agreements entered into ... the performance of which contemplates or requires the franchisee to establish or maintain a place of business in this state." Conn.Gen.Stat. § 42–133h. Defendant's "marketing focus" interpretation is unwarranted. The purpose of the Act is "to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee." *M & S Audio, Inc v. Bogen Communications, Inc.,* 1992 WL 231459 (Conn.Super.Ct.) The Act, therefore, regulates the relationship between the franchisor and the franchisee, not between the franchisee and the consumer. As Chem–Tek maintains its place of business in Connecticut, the Act would apply. Accordingly, GM's motion to dismiss the Franchise Act claim is denied.

### III. Tortious Interference With a Business Expectancy

■ The Connecticut courts have long recognized a cause of action for tortious interference. *Blake v. Levy,* 191 Conn. 257, 260, 464 A.2d 52 (1983). The essential elements of a claim for tortious interference

with a business expectancy are: the existence of a business relationship; the alleged tortfeasor's knowledge of that relationship; intentional interference with the relationship; and consequential loss. *Solomon v. Aberman,* 196 Conn. 359, 383, 493 A.2d 193 (1985); *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co.,* 169 Conn. 407, 415, 363 A.2d 86 (1975).

■ However, not every act that interferes with a business relationship is actionable. "Obviously, full, fair and free competition is necessary to the economic life of a community, and one may, by legitimate means, interfere with a competitor's mere expectancy that his business relations will continue." *Harry A. Finman & Son,* 169 Conn. at 415, 363 A.2d 86. The plaintiff must prove that the defendant's conduct was tortious, *i.e.,* "that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously." *Blake,* 191 Conn. at 261, 464 A.2d 52 (quoting *Kecko Piping Co. v. Monroe,* 172 Conn. 197, 201–02, 374 A.2d 179 (1977)).

■ Chem–Tek has alleged sufficient facts to state a claim for tortious interference. It claims that it had a business relationship with the GM car dealer and distributor network, that GM knew of this relationship, that GM intentionally misrepresented the nature and substance of its agreement with Chem–Tek to the GM network, and that Chem–Tek suffered actual loss as a result of GM's misrepresentation. GM is correct in stating that Chem–Tek's allegation of misrepresentation, and therefore its tortious interference claim, rests on the proposition that "Chem–Tek, rather than GM, had the authority to offer, sell or distribute the vehicle protection products." Defendant's Reply at 13. If GM had the authority to sell the GM Goodwrench and AC Delco products, the parts and accessories information bulletins announcing their discontinuance are not misrepresentations. Chem–Tek is entitled, however, to bring forth evidence to prove its claim. The motion to dismiss is therefore denied as to the tortious interference claim.

## IV. *Connecticut Unfair Trade Practices Act*

■ Plaintiff's complaint contains two counts alleging violations of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42–110a *et. seq.* ("CUTPA"). Chem–Tek claims that the conduct underlying both the Franchise Act and tortious interference claims violates CUTPA. To succeed on a CUTPA claim, the plaintiff must satisfy two threshold requirements. First, the plaintiff must establish conduct that constitutes an unfair or deceptive trade practice. Second, the plaintiff must establish a basis for a reasonable estimate of damages. *A. Secondino & Son, Inc. v. LoRicco,* 215 Conn. 336, 576 A.2d 464 (1990).

■ The Connecticut Supreme Court has adopted the "cigarette rule" promulgated by the Federal Trade Commission for determining when a practice is unfair. It must be determined:

1) whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory or other established conduct of unfairness; 2) whether it is immoral, unethical, oppressive or unscrupulous; 3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].

*McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 473 A.2d 1185 (1984). All three criteria need not be satisfied. *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 612 A.2d 1130 (1992). The substantial injury factor itself involves a three-part test: "1) it must be substantial; 2) it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and 3) it must be an injury that consumers themselves could not have reasonably avoided." *Web Press Services Corp. v. New London Motors, Inc.,* 205 Conn. 479, 484, 533 A.2d 1211 (1987) (citations omitted).

■ The Complaint states a claim under CUTPA. Application of the "cigarette rule"

involves contested factual allegations which cannot be resolved on the pleadings. Chem–Tek is entitled to bring forth evidence to establish that GM's conduct is unfair or deceptive. Chem–Tek is also entitled to bring forth evidence to establish a basis for a reasonable estimate of damages. Accordingly, the CUTPA claims will not be dismissed.

## V. *Breach Of Contract*

In pleading an action for breach of contact, plaintiff must plead: 1) the existence of a contract or agreement; 2) the defendant's breach of the contract or agreement; and 3) damages resulting from the breach. *O'Hara v. State*, 218 Conn. 628, 590 A.2d 948 (1991). The allegations in Chem–Tek's complaint are sufficient to withstand a motion to dismiss. Chem–Tek alleges that it entered into a three-year agreement with GM to manufacture vehicle protection products under the GM trademark; that GM unlawfully terminated this agreement; and that Chem–Tek suffered damages as a result. Hence, GM's motion to dismiss is denied as to the breach of contract claim.

## VI. *Promissory Estoppel*

The essential elements of a claim for promissory estoppel are: 1) a clear and definite promise; 2) a change in position in reliance on the promise; and 3) resulting injury. See *Kimberly–Clark Corp. v. Dubno*, 204 Conn. 137, 148, 527 A.2d 679 (1987); *D'Ulisse–Cupo v. Bd. of Directors of Notre Dame High School*, 202 Conn. 206, 213–15, 520 A.2d 217 (1987). The promise must be sufficiently clear and definite such that the promisor could reasonably expect to induce reliance. *D'Ulisse–Cupo*, 202 Conn. at 214, 520 A.2d 217.

Chem–Tek alleges that GM promised through communications and conduct that Chem–Tek would be authorized to sell, manufacture and distribute vehicle protection products bearing the GM trademark for a minimum of three years. Chem–Tek further alleges that in reliance on this promise, it agreed to reduce its prices, maintained a manufacturing process, sales and distribution network, and forewent other potentially lucrative business opportunities. Chem–Tek

alleges that this change in position caused it to sustain damages. Whether the representations were sufficiently definite for GM to reasonably expect Chem–Tek to change its position in reliance on them involves questions of disputed material fact. GM's motion to dismiss the claim for promissory estoppel is denied.

## *Conclusion*

The defendant's motion to dismiss (document # 8) is denied.

SO ORDERED.