**SUBSOLUTIONS, INC., et al.**

v.

**DOCTOR'S ASSOCIATES, INC., et al.**

**No. 3:98CV470 AHN.**

United States District Court,
D. Connecticut.

Aug. 2, 1999.

Raul Davila–Carlos, E. Glastanbury, CT, for Plaintiffs.

Edward Wood Dunham, New Haven, CT, for Defendants.

### RULING ON DEFENDANTS' MOTION TO DISMISS

NEVAS, District Judge.

The plaintiffs, Subsolutions, Inc. ("SSI") and Deco Solutions Group, Inc. ("DSG"), bring this action against the defendants, Doctor's Associates, Inc. ("DAI") and Computer Register Associates, Inc. ("CRA"), alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and section 14 of the Clayton Act, 15 U.S.C. § 14. The plaintiffs also bring a state law claim for tortious interference with a business expectancy and allege violations of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. §§ 42–110a to –110q ("CUTPA").[1]

---

1. The plaintiffs originally named Retail Business Systems, Inc. ("RBS") as an additional defendant in this action. On April 1, 1998, RBS filed a motion to dismiss. Because the plaintiffs failed to file a memorandum in opposition within twenty-one days of the date RBS filed its motion, the court granted the motion to dismiss absent objection on May 11, 1998. See D. Conn. L. Civ. R. 9(a) (recognizing that the "[f]ailure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion"). The plaintiffs failed to seek timely reconsideration of this ruling. See D. Conn. L. Civ. R. 9(e) (requiring that motions for reconsideration be filed "within ten (10) days of the filing of the decision or order from which such relief is sought").

Now pending is DAI and CRA's Motion to Dismiss. For the reasons set forth below, the motion [doc. # 74] is GRANTED IN PART and DENIED IN PART.

## STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all factual allegations in the complaint and must construe any well-pleaded factual allegations in the plaintiff's favor. *See Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998); *Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir. 1991). A court may dismiss a complaint only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Still v. DeBuono*, 101 F.3d 888 (2d Cir.1996). A court must not consider whether the claim will ultimately be successful, but should merely "assess the legal feasibility of the complaint." *See Cooper*, 140 F.3d at 440 (citation omitted). In fact, "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (internal citations and quotation marks omitted); *accord George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.1998); *Strobl v. New York Mercantile Exch.*, 561 F.Supp. 379, 383 (S.D.N.Y.1983); *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 28 (S.D.N.Y.1985); *Eye Encounter, Inc. v. Contour Art., Ltd.*, 81 F.R.D. 683, 686 (E.D.N.Y.1979). In deciding such a motion, consideration is limited to the facts stated in the complaint or in documents attached thereto as exhibits or incorporated therein by reference. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

## FACTS

DAI, one of the defendants, is a Florida corporation with its principal place of business in Milford, Connecticut, that sells and services "Subway" sandwich shop franchises. (*See* Am. Compl. ¶ 4.) DSG, one of the plaintiffs, is a Florida corporation which develops and services point of sales systems ("POS systems"), a computerized alternative to conventional cash registers. (*See id.* ¶ 2.) SSI, the other plaintiff and another Florida corporation, markets and sells DSG's POS systems to Subway franchisees.[2] (*See id.* ¶ 3.) SSI also provides extended service agreements to Subway franchisees who purchase DSG's POS system. (*See id.*) CRA, the other defendant, is a Florida corporation and DAI affiliate, that is in the process of developing POS system software for use in Subway sandwich shops. (*See id.* ¶¶ 5, 21.)

Under the Subway franchise agreement, franchisees are only permitted to use Subway approved products and equipment.[3] (*See id.* ¶ 18.) A Subway franchisee who uses unauthorized goods or equipment is subject to termination by DAI. (*See id.*) Since 1992, SSI has been an approved Subway POS system vendor. (*See id.* ¶ 14.) In this capacity, SSI has sold approximately 1,565 POS systems to Subway franchisees. (*See id.*)

For the past fifteen years, RBS, a New York corporation, has exclusively supplied cash registers to Subway restaurants. (*See id.* ¶ 6.) RBS also provides POS hard-

2. According to the plaintiffs, "POS systems allow Subway franchisees to transmit certain sales figures and other financial data to DAI's home office electronically, and/or to reproduce the sales figures and other financial data in the format required by DAI." (Am. Compl. ¶ 7.) The POS systems developed by DSG "are designed and programmed pursu-ant to operational specifications issued by DAI." (*Id.* ¶ 8.)

3. SSI claims that prospective franchisees must agree to all of the terms of the Subway franchise agreement in order to operate a Subway franchise. (*See id.* ¶ 37.)

ware and software systems to Subway franchisees. (*See id.*)

· On February 24, 1998, DAI implemented a policy which mandated that all Subway franchisees employ a POS system by January 1, 2001. (*See id.* ¶ 9.) Franchisees who refuse to comply with this policy are subject to termination. (*See id.*) This policy evolved out of an agreement between DAI and RBS, in which they recognized that RBS would be the "sole DAI approved POS vendor in the Subway POS market."[4] (*Id.* ¶ 19.) Apparently, RBS's exclusive vendor status terminates once DAI's affiliate, CRA, develops its own POS system. (*See id.* ¶ 22.) This agreement effectively forecloses SSI, as well as other POS vendors, from the Subway POS market.[5] (*See id.* ¶ 19) The plaintiffs allege that this agreement is part of a conspiracy between DAI, RBS and CRA to unreasonably restrain competition in the Subway POS market. (*See id.* ¶ 20.)

On March 12, 1998, the plaintiffs commenced this action. An amended complaint was subsequently filed on October 27, 1998, raising various antitrust and state law claims against DAI and CRA.

## DISCUSSION

### I. *Allegations of an "Antitrust Injury"*

■ In order to have standing to bring a private antitrust claim, a plaintiff must allege more than a personal injury. *See Balaklaw v. Lovell,* 14 F.3d 793, 797 (2d Cir.1994); *George Haug Co.,* 148 F.3d at 139. Such an action may be pursued only where an antitrust injury is present. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the

anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690. In examining this requirement, a court must keep in mind "the fundamental tenet that [t]he antitrust laws ... were enacted for the protection of *competition,* not *competitors.*" *Balaklaw,* 14 F.3d at 797 (citations and internal quotation marks omitted).

The defendants initially argue that the plaintiffs' antitrust claims must be dismissed because the plaintiffs have not alleged a cognizable antitrust injury, *i.e.,* an injury to competition as a whole. The defendants rely heavily on *Balaklaw* in support of their position. In *Balaklaw,* the plaintiff physician was the president of a private group of doctors who were solely responsible for meeting a hospital's anesthesiology requirements. *See Balaklaw,* 14 F.3d at 795–96. No written contract governed this relationship. *See id.* The hospital subsequently decided to solicit proposals from outside physicians in an effort to establish an exclusive contract for its anesthesiology needs. *See id.* at 796. Nine interested parties, including the plaintiff physician's group, submitted proposals to the hospital. *See id.* Although interviewed by the hospital, the plaintiff physician's group was ultimately not awarded the contract. *See id.* The plaintiff physician brought suit claiming that the selection process was anticompetitive and thus, a violation of the Sherman Act. *See id.* In affirming the district court's grant of summary judgment, the Second Circuit held that there was no antitrust injury because the plaintiff's "claimed injury came as a result of his losing out in the competition for an exclusive anesthesiology contact at [the hospital], and nothing more." *Id.* at 798.

---

4. The plaintiffs claim that traditionally the SSI POS system outsold the RBS POS system by a four to one margin. (*See id.* ¶ 44.)

5. SSI alleges, however, that DAI will not terminate the franchisee agreement of any Subway franchisees who purchased the SSI POS system prior to February 24, 1998. (*See id.* ¶ 25.)

■ The defendants argue that the present case is similar to *Balaklaw* because: (1) DAI unilaterally selected RBS as the supplier of POS systems at the culmination of an open and vigorous competitive process, and (2) DAI chose RBS for pro-competitive reasons, including the fact that RBS's POS system offered the lowest price to the consumer. (*See* Mem. of Law of DAI and CRA in Supp. of Mot. to Dismiss at 6 [hereinafter "Defs.' Mem."].) Neither of these facts are contained in the plaintiffs' amended complaint. Rather, the defendants extract this information from the plaintiffs' original complaint. Because "[i]t is well established that an amended complaint ordinarily supercedes the original, and renders it of no legal effect," *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 68 (2d Cir.1998) (citations and internal quotation marks omitted), the defendants' reliance on the plaintiffs' original complaint is misplaced. While statements from the original complaint may be used as impeachment evidence at trial, *see Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir.1989); *Decker v. Vermont Educ. Television, Inc.*, 13 F.Supp.2d 569, 572 (D.Vt. 1998), the court should not consider such statements on a motion to dismiss.

■ Here, the plaintiffs' amended complaint contains numerous allegations that other competitors in the POS market have been injured as a result of the defendants' actions. (*See* Am. Compl. ¶¶ 19–20, 24.) Such allegations are sufficient to survive a motion to dismiss. *See Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F.Supp. 1279, 1291 (D.Del.1995) (finding that plaintiff had "satisfied its minimal burden of pleading harm not only to itself, but also to others in the competitive land-

scape and thus to competition"); *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc.*, 725 F.Supp. 669, 677–78 (N.D.N.Y.1989) (same); *cf. Falstaff Brewing Co. v. Stroh Brewery Co.*, 628 F.Supp. 822, 827 (N.D.Cal.1986) (holding that an antitrust complaint was defective where it failed to allege an injury to competition). When the facts of *Balaklaw* are compared to those alleged in the plaintiffs' amended complaint, it is evident that *Balaklaw* is distinguishable. First, the physician plaintiff in that case alleged nothing more than a personal injury. *See Balaklaw*, 14 F.3d at 796. Second, the *Balaklaw* court found that the exclusive anesthesiology contract entered into by the hospital actually enhanced competition because it expired after three years. *See id.* at 799. Here, there are no allegations that the agreement entered into between DAI and RBS is of a limited duration. Both of these factors limit the applicability of *Balaklaw* to the present case.

Accordingly, the court holds that the plaintiffs have sufficiently alleged an antitrust injury in their amended complaint.

## II. *The Tying Claim*

■ Generally, a tying arrangement occurs where a party will sell one product (the "tying product") only if the buyer also purchases another product (the "tied product") or at least agrees that he will not purchase the tied product from any other entity. *See Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The plaintiffs' tying claim is apparently predicated on both Section 1 of the Sherman Act[6] and Section 14 of the Clayton Act.[7] *See De Jesus v. Sears Roebuck & Co.*,

---

6. This statute provides, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C.A. § 1 (West 1997).

7. Section 14 provides that:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding

*Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (recognizing that a tying claim under either the Sherman Act or Clayton Act involves identical elements).

■ A plaintiff must allege five essential elements in order to demonstrate an illegal tying arrangement. *See id.* These elements include:

> first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a "not insubstantial" amount of interstate commerce in the "tied" market.

*Id.* at 70 (citation omitted). Here, the defendants argue that the plaintiffs' claim must be dismissed because the plaintiffs cannot satisfy the first, third, and fourth elements of an illegal tying arrangement. The court disagrees.

### A. *Existence of Separate Products*

■ The plaintiffs allege that the Subway trademark is the tying product and the POS system is the tied product. (*See* Am. Compl. ¶¶ 29–30.) The Second Circuit has specifically recognized that a franchisor's trademark may constitute a separate product for purposes of a tying arrangement. *See Susser v. Carvel Corp.,* 332 F.2d 505, 519 (2d Cir.1964) (recognizing that "[t]he true tying item was rather the Carvel trademark, whose growing repute was intended to help the little band of Carvel dealers swim a bit faster than their numerous rivals up the highly competitive stream"); *see also Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.,* 754 F.2d 91, 96 (2d Cir.1985) (stating that "a trademark could in proper circum-

stances constitute a separate tying product") (citation omitted); *Esposito v. Mister Softee, Inc.,* No. 75 C 555, 1979 WL 1733, at *8 (E.D.N.Y.1979) (finding a tying arrangement where the defendants conditioned the plaintiffs' "right to the use of the trademark of Mister Softee upon their purchasing of all their supplies from a designated supplier"), *modified on other grounds by* No. 75 CV 555, 1983 WL 1806 (E.D.N.Y. Apr.11, 1983); *accord Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 722 (7th Cir.1979); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 47 (9th Cir.1971); *Little Caesar Enter. v. Smith,* 34 F.Supp.2d 459, 467 (E.D.Mich.1998); *Wilson v. Mobil Oil Corp.,* 940 F.Supp. 944 (E.D.La.1996). In light of this authority, the plaintiffs could make out a tying claim by alleging that the Subway trademark constitutes the tying product.

#### i. *Are there Separate Markets for the Subway Franchise and the POS System?*

The defendants argue that the plaintiffs cannot establish the first element of a tying claim because there is "no market for the Subway POS system distinct from the Subway franchise market." (Defs.' Mem. at 9.) Two Supreme Court cases control the court's consideration of this issue.

In *Jefferson Parish Hosp. v. Hyde,* the Supreme Court stressed "that the answer to the question whether one or two products are involved turns not on the *functional* relation between them, but rather on the character of the demand for the two items." 466 U.S. 2, 19, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (emphasis added). In *Jefferson Parish,* the Court recognized that anesthesiology services constituted a separate product from hospital services and rejected the defendant's argument

that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C.A. § 14 (West 1997).

that by linking the two the hospital was "merely providing a functionally integrated package of services." *Id.* at 19, 104 S.Ct. 1551. Because "there [was] a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it [was] efficient to offer anesthesiological services separately from hospital services," *id.* at 21–22, 104 S.Ct. 1551, the Court concluded that the first element of a tying claim was satisfied.

In *Eastman Kodak*, the Supreme Court confronted Kodak's "policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service." 504 U.S. at 458, 112 S.Ct. 2072. The Court applied the criteria of *Jefferson Parish* in an effort to ascertain whether service and parts constituted separate products for purposes of a tying claim. *See Eastman Kodak*, 504 U.S. at 462–63, 112 S.Ct. 2072. Kodak argued that parts and service were functionally linked and specifically "insist[ed] that because there is no demand for parts separate from service, there cannot be separate markets for service and parts." *Id.* at 463, 112 S.Ct. 2072. The Court disagreed and found that a factual question existed on this issue because service and parts had been "sold separately in the past and still are sold separately to self-service equipment owners." *Id.* at 462, 112 S.Ct. 2072. The Court commented that "the development of the entire high-technology service industry is evidence of the efficiency of a separate market for service." *Id.*

Recently, a district court has applied the reasoning of both *Jefferson Parish* and *Eastman Kodak* to the franchise context. *See Little Caesar Enter.*, 34 F.Supp.2d at 459. There, the plaintiffs, a class of "Little Caesar's" franchisees, accused the defendant of unlawfully tying the sale of certain items from a wholly-owned subsidiary of Little Caesar to "the sale and continued operation of the Little Caesar franchises." *Id.* at 464. These items included,

in pertinent part, "condiments with [Little Caesar's] proprietary symbols and marks." *Id.* at 463. Little Caesar argued that there were not two separate markets for its logoed products and its franchise because the logoed items "could not be sold anywhere or used anywhere separate from a [Little Caesar's franchise]." *Id.* at 468. The court rejected this reasoning. Instead, the court found that the proper test was whether it would be "efficient for a firm to provide [these items] separate from the [Little Caesar's] franchise." *Id.* at 469 (citation and internal quotation marks omitted). The court found that two distinct markets existed because, in the past, "other private distributors, unrelated to Little Caesar, sold all the goods and services necessary to run Little Caesar franchises, including logoed paper goods." *Id.* at 469. These products were sold separately from the franchise itself. *See id.* The court also noted that Little Caesar had recently approved several new distributors to provide these items to its franchisees. *See id.* Because these items had been sold separately in the past, the court concluded that the market for Little Caesar's franchises was separate from the market for logoed goods. *See id.* at 470.

▪ The court finds the reasoning of *Little Caesar Enter.* persuasive and hereby adopts it. Applying the consumer demand test to the present case, the court finds that the plaintiffs have alleged the existence of two distinct product markets. First, the amended complaint asserts that Subway franchisees "must purchase the POS system(s) for use in their Subway submarine sandwich franchise(s) from other firms, not DAI." (Am.Compl.¶ 31.) The plaintiffs further assert that prior to February 24, 1998, there were eight POS system vendors who competed for sales in the Subway POS system market. (*See id.* ¶ 16.) Apparently, none of these vendors were related to DAI. The fact that a separate market for these POS system vendors evolved evidences that the Subway franchise market is distinct from the POS sys-

tem market. *See Little Caesar Enter.*, 34 F.Supp.2d at 470.[8]

Accordingly, the court finds that the plaintiffs have properly alleged the first element of their tying claim.

### B. *Does DAI Possess Sufficient Market Power in the Tying Product Market?*

#### i. *Relevant Product Market*

The defendants next argue that the plaintiffs' amended complaint does not define a valid market for the tying product. The court agrees.

In order to make out their antitrust claim, the plaintiffs "must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Re–Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F.Supp. 387, 391 (S.D.N.Y.1993) (citation omitted); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997) (recognizing that the plaintiff bears "the burden of defining the relevant market") (citation omitted); *Hack v. President & Fellows of Yale College*, 16 F.Supp.2d 183, 196 (D.Conn.1998) (same). "The relevant product market includes all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand."[9] *Re–Alco*, 812 F.Supp. at 391 (citation omitted); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (stating that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it").

Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. *Queen City Pizza*, 124 F.3d at 436; *see also Hack*, 16 F.Supp.2d at 196 (stating that a complaint may be dismissed where it does not define the relevant market by reference to the rule of reasonable interchangeability and cross-elasticity); *Re–Alco*, 812 F.Supp. at 391 (same); *E. & G. Gabriel v. Gabriel Bros., Inc.*, No. 93 CIV. 0894(PKL), 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (same).

In their amended complaint, the plaintiffs define the relevant market as follows:

> The Subway sandwich franchise sold by DAI is interchangeable only with sandwich franchises that are similar in price and that have similar qualities to the Subway sandwich franchise sold by DAI (the 'Sandwich Franchise Market'). Alternatively, the Sandwich Franchise Market is a sub-market within the market for fast food franchises.[10]

---

8. It is the defendants' position that *Casey v. Diet Ctr., Inc.*, 590 F.Supp. 1561 (N.D.Cal. 1984), provides the better reasoned approach to this issue. In *Casey*, the plaintiffs complained that the defendant tied the sale of its franchise, Diet Center, with the sale of certain nutritional products, including "Diet Supp." *See Casey*, 590 F.Supp. at 1563. The plaintiffs argued that equivalent nutritional products were available from various other sources for less money. *See id.* The court found no tying arrangement because "the demand for the Diet Supp is not separate from that for the franchise: it is generated wholly by the franchisee's operation of the franchise." *Id.* at 1564. Because *Casey* employs essentially a functional approach to this issue, the court finds it unpersuasive.

9. "[P]roducts in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (citation omitted).

10. "Ultimately, a 'submarket' definition turns on the same inquiry as a 'market' definition— 'whether the products in a proposed

(Am.Compl. ¶ 28.) The defendants maintain that these allegations are "so vague and so narrowly circumscribed as to be meaningless under basic principles of antitrust law." (Reply Mem. of Law of DAI and CRA in Further Supp. of their Mot. to Dismiss at 6 [hereinafter "Defs.' Reply"].) The court agrees.

The plaintiffs' amended complaint contains no allegations regarding substitute products, does not differentiate the Subway franchise from comparable franchise opportunities, and does not include any facts regarding cross-elasticity of demand.[11] These deficiencies require that the defendants' motion to dismiss be granted with respect to this issue. *See Re–Alco*, 812 F.Supp. at 391 (stating that "[i]f a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand ... a court may grant a Rule 12(b)(6) motion").[12] However, this determination does not end the inquiry.

ii. *Is the Market Power Element Satisfied by the Plaintiffs' "Lock–In" Theory?*

■ Relying on *Eastman Kodak*, the plaintiffs alternatively argue that the market power element may still be satisfied despite the fact that the defendants lacked appreciable economic power in the tying product market of fast-food restaurants. Specifically, the plaintiffs argue that the franchisees have become "locked in" a relationship with DAI after substantially investing in the development of the franchise. The plaintiffs maintain that such a situation can satisfy the market power element. The court agrees.

As recognized previously, *Eastman Kodak* involved Kodak's "policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service." 504 U.S. at 458, 112 S.Ct. 2072. Kodak argued that because it lacked market power in the overall photocopier and micrographic equipment market, the fact that it possessed economic power in the aftermarket of parts and services was not sufficient to make out an antitrust claim. *See Eastman Kodak*, 504 U.S. at 465–66, 112 S.Ct. 2072. The Court rejected this claim on two grounds. First, the Court noted that because of the expense and difficulty of obtaining "lifecycle pricing" data when purchasing a copying machine, less sophisticated consumers may not consider such factors as the future price of parts and services for Kodak equipment at the time of their purchase. *See id.* at 473–74, 112 S.Ct. 2072. Second, and primarily relevant here, the Court stated that existing Kodak copier owners could face higher prices

submarket are reasonably interchangeable in use or production with products in the broader market.' " *Pepsico, Inc. v. Coca–Cola Co.*, No. 98 CIV. 3282(LAP), 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998) (citation omitted). Thus, the same pleading requirements which govern the relevant market also apply to the relevant sub-market. *See id.*

11. As the defendants persuasively point out, consumers considering franchise opportunities would certainly look to other fast food franchise alternatives if Subway was to suddenly raise its franchise fees. Moreover, consumers would also eat at other fast food restaurants if Subway's menu prices dramatically increased.

12. The plaintiffs maintain that the Second Circuit has found that "the proper tying product market in franchise tying cases, as a matter of law, is the market for franchising opportunities similar to that offered by the defendant." (Mem. in Supp. of Pls.' Objection to Defs.' Mot. to Dismiss at 19 [hereinafter "Pls.' Opp'n"].) The plaintiffs rely on both *Susser* and *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658 (2d Cir.1974). Neither of these cases supports this proposition. In fact, in *Susser* the court recognized that Carvel dealers "*competed not only with similar chains*— Dairy Queen, Tastee Freez, Dari–Delite, King Kone, Dari–Isle, and others, but also with chains and independents utilizing mobile units, with chain stores and operations such [as] Howard Johnson, and with the ubiquitous corner drug-store." *Susser*, 332 F.2d at 518–19 (emphasis added).

switching to an alternative copier than by paying the supracompetitive parts and service prices charged by Kodak. *See id.* at 476, 112 S.Ct. 2072. Thus, these consumers were "locked in" to accepting Kodak's parts and services arrangement because Kodak imposed the tie-in only after the consumers had expended significant capital purchasing the copier. *See id.*

Few courts have faced the difficult task of applying the Supreme Court analysis in *Eastman Kodak* to the franchise context. However, a well-reasoned approach to this issue was developed in *Little Caesar Enter.*, 34 F.Supp.2d at 470–513. There, the court recognized that

> [a] buyer knowing an announced or generally understood restrictive policy, or even a buyer who could reasonably anticipate the risk of such a future policy can compare whether similar risks were faced with alternate competitors in the foremarket, or whether contractual protections would be available in the contract with the seller.

*Id.* at 490. Thus, the court found that a plaintiff may pursue a "lock-in" theory in the franchise context only if he demonstrates that a reasonable person could not "reasonably anticipate later 'exploitation' when they bought the ... franchise and that they could not reasonably protect themselves in the marketplace by obtaining ... contract guarantees or warranties from the defendant or his rivals." *Id.* (citation omitted). This examination requires a court to determine what a reasonable franchisee knew at the time he entered into the franchise agreement. *See id.*

Applying the approach taken by the court in *Little Caesar Enter.* to this case, the court finds that the plaintiffs have alleged sufficient facts to make out a "lock-in" claim. First, at the time many of the franchisees entered into their franchise agreement with DAI the POS system was

merely optional.[13] (*See* Am. Compl. ¶ 10.) Moreover, those franchisees who desired to purchase a POS system were not limited to a single POS vendor. (*See id.* ¶ 10.) On February 24, 1998, however, DAI implemented a policy requiring that Subway franchisees employ a POS system on or before January 1, 2001. (*See id.* ¶ 9.) DAI further designated RBS as the sole approved POS system vendor. (*See id.* ¶ 19.) Because this policy was not in place at the time many franchisees entered into their agreements with DAI, it is arguable that the franchisees could not reasonably foresee that DAI would implement such a restriction. A determination regarding this issue can only be made at a later point in this litigation. For purposes of deciding a motion to dismiss, these allegations satisfy the second element of the plaintiffs' tying claim.

## C. Anticompetitive Effects in the Tied Product Market

■ The defendants next argue that because the selection of RBS as the exclusive vendor of POS systems "produced a sharp cut in the price that Subway franchisees must pay for POS systems," the plaintiffs cannot establish anticompetitive effects in the POS system market. (*See* Defs.' Mem. at 14.) There are no facts in the amended complaint that indicate that DAI's selection of RBS as the exclusive POS vendor resulted in a price decrease to Subway franchisees. The defendants' attempt to raise this fact on a motion to dismiss is puzzling and will not be considered by the court at this stage of the litigation.

In order to make out their tying claim, all the plaintiffs have to allege is "that the tying arrangement has or is substantially likely to have an anticompetitive effect in the market for the tied product." *Helen Brett Enter. v. New Orleans Metro. Con-*

---

**13.** The plaintiffs allege that a franchisee's initial investment can range from $60,000 to $149,800.

*vention & Visitors Bureau,* Civ. A. No. 95–2888, 1996 WL 346314, at *7 n. 5 (E.D.La. June 25, 1996) (citations omitted). Here, the plaintiffs allege that the defendants' tying arrangement has forced franchisees to purchase RBS's POS system despite the fact that numerous franchisees prefer SSI's POS system. (*See* Am. Compl. ¶ 44.) The plaintiffs further allege that the defendants actions foreclosed competition in the POS system market as a whole. (*See id.* ¶ 45.) Such allegations satisfy the liberal pleading requirements of the Federal Rules of Civil Procedure.

Accordingly, the plaintiffs have satisfied the fourth element of their tying claim and the defendants' motion to dismiss this cause of action is DENIED.

### III. *Antitrust Conspiracy*

■ To successfully bring a claim under Section 1 of the Sherman Act, a plaintiff must demonstrate "a combination or some form of concerted action between at least two legally distinct economic entities which constitutes an unreasonable restraint on interstate trade or commerce." *Daniel, M.D. v. American Bd. of Emergency Medicine,* 988 F.Supp. 112, 123 (W.D.N.Y.1997) (citations omitted). "Independent action is not proscribed." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *see also Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (recognizing that Section 1 of the Sherman Act does not reach actions which are "wholly unilateral") (citation omitted). Thus, as long as a manufacturer acts independently, it may generally deal, or refuse to deal, with whomever it chooses. *See Monsanto,* 465 U.S. at 761, 104 S.Ct. 1464.

■ An antitrust claim is not subject to any heightened pleading requirement and must simply be plead in conformity with Fed.R.Civ.P. 8(a). *See George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977). However, a

Section 1 conspiracy claim supported by vague and conclusory allegations of concerted activity cannot withstand a motion to dismiss. *See Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 220–21 (4th Cir.1994). "A mere allegation that the defendants violated the antitrust laws as to a particular plaintiff and commodity is insufficient to survive a Rule 12(b)(6) motion." *Id.* at 221 (citation and internal quotation marks omitted).

The defendants maintain that the plaintiffs' Section 1 conspiracy claim must be dismissed because the plaintiffs have alleged nothing more than unilateral action on the part of DAI. While the court agrees that this claim must be dismissed against CRA, the plaintiffs may maintain this claim against DAI.

■ The plaintiffs' allegations that CRA participated in an antitrust conspiracy are both vague and conclusory. The amended complaint provides, in relevant part:

> The DAI/RBS Contract is part of a conspiracy between DAI, CRA and RBS ... to unreasonably restrain and/or eliminate competition in the Subway POS Market by forcing Subway franchisees within the Subway POS Market to purchase the RBS POS System and/or CRA POS system once developed, depriving Subway franchisees from access to competitive POS vendors other than RBS and excluding SSI and other competitive POS system vendors from the Subway POS market.

(Am.Compl.¶ 20.) The plaintiffs further allege that CRA is currently in the process of developing its own POS system and that DAI intends to designate CRA as the sole approved supplier in the near future. (*See id.* ¶¶ 21–22.) The plaintiffs' amended complaint contains no allegations that CRA entered into an agreement with either DAI or RBS. There are also no allegations that CRA participated in any meetings with either DAI or RBS. Moreover, the plaintiffs have failed to assert

that these three entities even communicated with each other. Given that the amended complaint contains no allegations from which it can be inferred that CRA participated in a conspiracy in violation of Section 1 of the Sherman Act, this claim is dismissed with respect to CRA.

■ While not detailed, the allegations against DAI are sufficient to survive a motion to dismiss. The complaint alleges that DAI and RBS entered into an agreement on February 24, 1998, pursuant to which RBS was designated DAI's sole approved POS system vendor. (*See* Am. Compl. ¶ 19.) The plaintiffs allege that the purpose of this agreement was to deprive Subway franchisees "from access to competitive POS vendors" and to exclude other POS system vendors from the POS market. (*See id.* ¶¶ 19–20.) The plaintiffs further allege that DAI ultimately seeks to designate its own affiliate, CRA, as the sole approved POS system vendor. (*See id.* ¶ 20.) Such an action would obviously further DAI's economic interests to the detriment of other competitors. These allegations are sufficient to state a Section 1 conspiracy claim against DAI. *See Daniel,* 988 F.Supp. at 123–24 (recognizing that to state a claim under Section 1 of the Sherman Act "a plaintiff must assert facts demonstrating that the alleged competitors entered into an agreement which was designed to further their own economic interests while at the same time excluding other threatening competitors").

### IV. *Tortious Interference with a Business Expectancy*

■ In the third count of their complaint, the plaintiffs bring a state law claim for tortious interference with a business expectancy against DAI. The fundamental elements of this claim are: "the existence of a business relationship; the alleged

tortfeasor's knowledge of that relationship; intentional interference with the relationship; and consequential loss." *Chem–Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123, 130 (D.Conn.1993) (citing *Solomon v. Aberman,* 196 Conn. 359, 383, 493 A.2d 193 (1985); *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Serv. Co.,* 169 Conn. 407, 415, 363 A.2d 86 (1975)).

Given the nature of competition, not all conduct that interferes with a business relationship is actionable. *See Chem–Tek,* 816 F.Supp. at 130; *see also Harry A. Finman & Son,* 169 Conn. at 415, 363 A.2d 86 (recognizing that "fair and free competition is necessary to the economic life of a community, and one may, by legitimate means, interfere with a competitor's mere expectancy that his business relations will continue"). Rather, the plaintiff must establish that the defendant's behavior was tortious. *See McKeown Distrib., Inc. v. Gyp–Crete Corp.,* 618 F.Supp. 632, 644 (D.Conn.1985). The plaintiff may make such a showing by alleging that the defendant "engaged in fraud, misrepresentation, intimidation, obstruction or molestation, or ... acted maliciously." *Id.* (internal citations and quotation marks omitted).

■ Here, the plaintiffs have sufficiently plead each element of this claim. The amended complaint alleges that the plaintiffs were involved in a business relationship with Subway franchisees. (*See* Am. Compl. ¶ 49.) The plaintiffs assert that despite the fact that DAI was aware of these relationships, it still intentionally interfered with them. (*See id.* ¶¶ 49, 51–53.) The plaintiffs contend that DAI's actions damaged their contractual relationships and caused them to suffer financial losses. (*See id.* ¶¶ 53–55.) Finally, the plaintiffs maintain that DAI acted intentionally and maliciously. (*See id.* ¶¶ 50–53.)

Because these allegations are sufficient to state a claim for tortious interference with a business expectancy, DAI's motion to dismiss this count is DENIED.

### V. CUTPA Claims

 The plaintiffs also bring claims pursuant to CUTPA against both DAI and CRA. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. Ann. § 42–110b(a) (West Supp.1999). Initially, a plaintiff must satisfy two factors in order to bring a CUTPA claim. See Chem–Tek, 816 F.Supp. at 130. First, the plaintiff must demonstrate that the defendant's conduct constitutes an unfair or deceptive practice. See id. "Second, the plaintiff must establish a basis for a reasonable estimate of damages." Id. (citation omitted).

In order to determine whether a trade practice is unfair or deceptive, the Connecticut Supreme Court "has adopted the so-called 'cigarette rule' developed by the Federal Trade Commission in the context of section 5(a)(1) of the Federal Trade Commission Act." Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1038 (2d Cir.1995). In applying the "cigarette rule," a court must consider:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].

Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239, 520 A.2d 1008 (1987) (citations omitted). A plaintiff does not have to satisfy all three of these factors. See Chem–Tek, 816 F.Supp. at 130.

 Here, the defendants concede that violations of either the Sherman Act or the Clayton Act can support a claim of unfair competition under CUTPA. See Times–Picayune Publ'g Co. v. United States, 345 U.S. 594, 609, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (recognizing that violations of the Sherman and Clayton Acts also transgress the Federal Trade Commission Act); Raybestos Prods. Co. v. Coni–Seal, Inc., 989 F.Supp. 166, 169 (D.Conn.1997) (finding that establishment of a claim under Section 2 of the Sherman Act also establishes a claim under CUTPA). The defendants argue, however, that because the plaintiffs have not established an antitrust claim, their CUTPA claims must also be dismissed. In opposition, the plaintiffs simply assert that they have adequately plead antitrust claims against both DAI and CRA and thus, have alleged CUTPA violations.

Because the court finds that the plaintiffs have stated an antitrust claim with respect to DAI, it likewise finds that the plaintiffs may maintain a CUTPA claim against this defendant. See Raybestos Prods., 989 F.Supp. at 169. The fact that the plaintiffs have failed to state an antitrust claim against CRA, however, requires that the CUTPA claim be dismissed with respect to this defendant.

### CONCLUSION

Based on the foregoing analysis, the defendants' Motion to Dismiss [doc. # 74] is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to CRA. The motion is denied, however, as to DAI.